### In the Matter of Disciplinary Proceedings against Harriet Bouslog SAWYER, a member of the Territorial Bar of the Territory of Hawaii, Respondent.[1]

#### No. 15109.

United States Court of Appeals
Ninth Circuit.

June 9, 1958.

Certiorari Granted Nov. 17, 1958.
See 79 S.Ct. 153.

**1.** The proceedings in the Supreme Court of the Territory of Hawaii were entitled "In the Matter of Harriet Bouslog Sawyer, also known as Harriet Bouslog, an attorney at law." In this court, the transcript was printed to indicate Harriet Bouslog Sawyer as appellant and the Bar Association of Hawaii as appellees. The pattern being thus revised, counsel followed it on their respective briefs. This court deems the original entitlement more appropriate and by this opinion restores it with only slight modification.

See also 256 F.2d 553.

John T. McTernan, Los Angeles, Cal., Myer C. Symonds, Honolulu, Hawaii, A. L. Wirin, Los Angeles, Cal., for petitioner.

A. William Barlow, U. S. Atty., Honolulu, Hawaii, Edward N. Sylva, Atty. Gen., Territory of Hawaii, Morio Omori, Sp. Deputy Atty. Gen., Honolulu, Hawaii, for respondent.

Before STEPHENS, Chief Judge, and HEALY, POPE, FEE, CHAMBERS, BARNES and HAMLEY, Circuit Judges.

CHAMBERS, Circuit Judge.

Harriet Bouslog Sawyer became a member of the Territorial Bar of Hawaii in 1941. Since then, except for four World War II years when she was in Washington, D. C., she has been engaged in the active practice of law at Honolulu. A large part of her work has been in the courtroom. Prior to 1941 she had been admitted to practice in Indiana and Massachusetts.

On August 29, 1951, a federal indictment was returned in Honolulu against Charles Kazuyuki Fujimoto and Jack Wayne Hall and five other residents of the Hawaiian Islands charging them jointly with violations of the Smith Act, 18 U.S.C.A. § 2385. On Labor Day five days later on the Island of Kauai she was pleading the cause of the defendants before a Labor Day audience, castigating Smith Act cases in general and this case in particular. That speech resulted in no charges against her and the date she commenced representation of defendants in the case is not clear.

The Honolulu Smith Act case went to trial on November 5, 1952. Eventually the trial was concluded and a jury verdict was returned on June 19, 1953, finding the defendants guilty.[2] It is definite that throughout the extended trial she was representing one or more defendants. Sometimes she missed sessions; if so, she was busy on legal research incident to the case.

On Sunday, December 14, 1952, during the period of the trial, she went to the town of Honokaa on the Island of Hawaii[3] and with the defendant Hall addressed a public meeting primarily attended by members of the International Longshoremen's and Warehousemen's Union. Some segment or segments of that union were financing in whole or in part the defense of the seven. The exact purpose of the meeting does not seem to be clear. Hall and Mrs. Sawyer were apparently the main speakers, although there were others. Based on their own subsequent testimony, it would be fair to characterize the gathering as some kind of an old fashioned "indignation meeting." The speeches of the two resulted in publicity throughout the Islands. The newspaper stories caused the trial judge, Honorable Jon Wiig, to suspend temporarily the trial and question Mrs. Sawyer in open court about her speech at Honokaa. When the colloquy was done, Judge Wiig announced he was not satisfied with her explanation and he instructed the U. S. Attorney for the District of Hawaii to make an investigation.[4] (Mrs. Sawyer's explanation and colloquy with the court is set forth as Appendix C.) No proceedings in the district court were ever brought.

2. The convictions were reversed by this court on January 16, 1958, upon the authority of Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356. See Fujimoto v. United States, 251 F.2d 342.

3. Honolulu is located on the Island of Oahu. The Island of Hawaii is popularly known throughout the Territory of Hawaii as the "Big Island."

4. A. William Barlow was the United States Attorney for the District of Hawaii during the Smith Act trial at Honolulu and an active participant in the trials. He left the office on September 2, 1954. He appears to have been active in the preparation of the case. He presented it to the legal ethics committee at its hearings which began November 24, 1954. Then, on July 8, 1955, he and the attorney general were appointed to present the case to the court. Barlow's representation in behalf of the complaint, and now the judgment, has continued on appeal.

Within a day or so after the verdict, a juror, David P. Fuller, Jr., suffered a nervous breakdown and generally became most incompetent. The case was "on his mind;" how much is disputed as is his rationality at the times of various conversations. Visits from Mrs. Sawyer and from Mrs. Sawyer and Hall to Fuller followed. A sister-in-law, Mrs. Ellen Fuller Cabreros, was present as well as Mrs. Fuller and one or more of the Fuller children. As a consequence of these visits and in support of the motion for a new trial Mrs. Fuller, Mrs. Cabreros and Hall all made affidavits as to statements made to them by Fuller,[5] the effect of which, if admissible, would be to prove by Fuller's statements to Mrs. Sawyer and Hall what went on in the jury room in the secret deliberations. The purpose was to impeach the verdict. Parenthetically, such affidavits ought to have been stricken from the file of the Smith Act case. (They were merely not considered.) It is hard to believe that counsel did not know of their inadmissibility.

After the close of the trial Judge Wiig orally requested the Hawaii Bar Association, through its president, to look into Mrs. Sawyer's professional conduct during the trial.

This resulted in the association filing on July 8, 1954,[6] with the Supreme Court of Hawaii one complaint with the two charges of misconduct in it against Mrs. Sawyer. One charge dealt with the Honokaa speech; the other with the manner of presentation and preparation (the surrounding conduct) of the affidavits. The second charge did not assert falsity, per se, of the affidavits.

The text of the complaint was as follows:

5. Mrs. Fuller refused to sign an affidavit prepared for her by Mrs. Sawyer.

6. Prior to April 21, 1954, under its Rule 19, charges against an attorney were authorized to be filed by the attorney general of Hawaii or "any person ag-

"Complaint Under Rule 19

"To the Honorable, the Justices of the Supreme Court of the territory of Hawaii:

"Comes now the Bar Association of Hawaii, an unincorporated association, and on information and belief complains to this Honorable Court under Rule 19 of the Rules hereof as follows:

I.

"That Harriet Bouslog Sawyer, hereinafter referred to as the Licensee, is and at all times hereinafter mentioned continuously has been an attorney-at-law duly licensed and admitted to practice before all of the courts of the Territory of Hawaii and before the United States District Court for the District of Hawaii, and that the said Licensee is now and during all of said times herein mentioned has been a practitioner before said courts.

II.

"That the said Licensee, while appearing as counsel of record for certain defendants in that certain case in the United States District Court for the District of Hawaii entitled 'United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et al., Defendants,' being Criminal Number 10495 in said Court, during the course of the trial of said case, to wit, on or about December 14, 1952, did say during a speech to a public gathering in Honokaa, Hawaii, that horrible and shocking things were going on at said trial; that a fair trial was impossible; that all of the rules of evidence were being scrapped so the government could make its case;

grieved." By an amendment made on April 21, 1954, charges were authorized to be filed by the attorney general, the Bar Association of Hawaii, or any person aggrieved.

that the rules of evidence and procedure were made up as the case proceeded; and that unless the trial was stopped in its tracks certain new crimes would be created.

### III.

"That said Licensee did during the course of said trial and shortly after rendition of a verdict therein visit a juror who was known by her to be indisposed, and thereafter submitted her affidavit concerning an interview with said juror to the presiding judge under circumstances indicating a failure to comply with standards of professional conduct required of practitioners of law licensed to practice before this Court.

"Wherefore, the Bar Association of Hawaii prays this Court to refer this complaint to the Committee on Legal Ethics and Unauthorized Practice of this Court for investigation in conformity with Rule 19 of the Rules of this Court.

"Dated: Honolulu, Hawaii, July 8, 1954.

"Respectfully submitted,
 "Bar Association of Hawaii
"By /s/ Masaji Marumoto,
 "Its President.

"[Endorsed]: Filed July 8, 1954.
"[Title of Supreme Court and Cause.]"

The Supreme Court of the Territory of Hawaii referred the complaint to its Legal Ethics Committee for investigation. Before holding a hearing the committee required the Bar Association of Hawaii to furnish a bill of particulars on the second charge. On September 29, 1954, the bill was filed as follows:

"Bill of Particulars

"Pursuant to an Order entered on September 21, 1954, by the Legal Ethics Committee, the following Bill of Particulars is hereby furnished:

"1. Copy of the affidavit of Harriet Bouslog, subscribed and sworn to before a notary public on the first day of July, 1953, signed by the Licensee Harriet Bouslog and filed in the United States District Court for the District of Hawaii on July 1, 1953, in the case of United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et al., Defendants, Criminal No. 10,495.

" 'Affidavit of Harriet Bouslog
" 'Territory of Hawaii,
" 'City and County of Honolulu–ss.
" 'I, Harriet Bouslog, being first duly sworn, on oath depose and say:

" 'On Friday evening, June 26, 1953, shortly before 6:00 o'clock I received a telephone call at my home from Ellen Fuller Cabreros, sister of David P. Fuller who sat as a juror in the case of United States v. Fujimoto, et al. Mrs. Cabreros asked me if I could come and see her brother; that he was seriously ill.

" 'I went to the Fuller home at 1734 Colburn Street and was taken by Mrs. Cabreros and Mrs. Fuller, into the front bedroom where Mr. Fuller was lying in bed. He appeared to be gravely ill.

" 'I talked with his wife, Helen Fuller, in the living room of their home in the presence of Ellen Fuller Cabreros and her friend, Grace Oshiro, and two of the Fuller children. All the members of the family present were upset and in tears at the state of Mr. Fuller. Mrs. Fuller stated that she had called a doctor to examine her husband and informed me that her husband had been ill since the return of the verdict, and particularly since early in the morning of Saturday, June 20, 1953, the morning after the verdict was returned.

" 'Mrs. Fuller said that on Saturday morning, the day immediately following the verdict of guilty in the Smith Act case, at about five o'clock in the morning, she found her husband on his knees praying, begging God for mercy, saying he had sinned, that he had lied in the eyes of God; that Jack Hall was innocent and the case was a frame-up; that

Jack Hall is a good man; that those people are doing good for humanity and here someone is trying to block them. She said that in the time since, her husband had told her that the jury only looked at the Government's case and scarcely talked at all about the defendant's side and their case; that he asked her and the children to forgive him because he had done something wrong and it was too late; he said that one of the jurors said the defendants were innocent, and when the other jurors said, "Guilty, guilty," that juror threw a book across the room and said they just as well forget about it. Mrs. Fuller said that her husband had wanted to go see the Judge and confess that he had lied, and once or twice tried to leave the house but was too upset mentally and physically and unable to leave the house by himself; that he fell and struck his head. She said that she and other members of her family urged him not to do anything, not to go to see the Judge and to forget about it, that he would only get himself in trouble and would get them in trouble, and that he might go to jail.

" 'Mrs. Fuller said that when he tried to leave and was unable to, she and other members of the family put him back in bed and tried to keep him quiet; that he kept shouting and crying and praying saying that the case was a frame-up, that he had done wrong, and told the children and her to stay away from him because he was not clean. She said that his condition seemed to get worse and worse as the days went by until on Friday, June 26, 1953, all day he was in bed and did not move or get up at all, and his voice became scarcely a whisper because he was hoarse from the shouting on previous days.

" 'After the conversation with Mrs. Fuller, I went in the bedroom where Mr. Fuller was and asked him if he wished a drink of water. He nodded that he did. During this time, Mrs. Fuller, his sister and her friend were present in the room. Mr. Fuller struggled to talk and make himself heard but because of his weakened physical condition and the loss of his voice, it was difficult to understand what he said. He stated understandably, however, that he wanted help and wanted to get a clear conscience and get the wrong he had done straightened out.

" 'Shortly after my arrival, a Doctor Chang arrived. I was not present in the bedroom during the conversation between Dr. Chang and Mrs. Fuller, although I could hear the conversation between Dr. Chang and Mrs. Fuller from the living room. After Dr. Chang had talked to Mrs. Fuller, Mrs. Fuller told me that the doctor said after examining her husband that there was nothing physically wrong with him, that he would have to rest in bed, and that it might be necessary to take him to a hospital unless he would get up to go to the bathroom.

" 'After the doctor had left, in the presence of Mrs. Fuller, Mrs. Cabreros and her friend, Grace Oshiro, and Mrs. Fuller's eldest daughter, I gave Mr. Fuller water and he was propped up in bed. Again he tried to talk but seemed to find difficulty in doing so. He said he wanted to talk about the matter and would talk to Jack Hall or anyone at any time to get a clear conscience.

" 'Shortly after this I left, believing Mr. Fuller needed rest. I made arrangements with Mrs. Fuller and Mr. Fuller to come to see him the next day with Jack Hall.

" 'On Saturday morning I was informed by Mrs. Cabreros that her brother was feeling considerably better and wanted to and would be able to see us.

" 'When Mr. Hall and I arrived at the Fuller home about 1:00 o'clock

Saturday afternoon, June 27, Mr. Hall put out his hand to Mr. Fuller, Mr. Fuller looked at Mr. Hall for a long time and finally took his hand. Mr. Hall told Mr. Fuller he did not hold anything against him; that he just wanted Mr. Fuller to get well.

" 'Mr. Fuller said to Mr. Hall that from the talk of guilty by other jurors in the jury room, he believed he had to vote guilty to protect his brothers because he was afraid they would be fired if he did not. Mrs. Fuller said that both of Mr. Fuller's brothers, Leonore and Harry, worked for Isle-Ways. Mrs. Fuller said that it wasn't right that they only looked at Government exhibits and not at the defendants' exhibits or case. He said it was a frame-up and said he blamed himself. He said that they looked at Government exhibits and any time someone suggested looking at defense exhibits some juror would say, "Later, later," and they never got around to it. He said that he knew and believed the defendants were innocent all the time but was afraid of what would happen if he voted not guilty.

" 'He said that the jury in their deliberations decided that the Communist Party was a conspiracy within the first hour after they began their deliberations. He said that the instruction of the Judge which they used to decide this was the one which told them first to decide whether there was a conspiracy, and they decided the Communist Party was a conspiracy. He said he knew from what he heard the defendants were convicted before the case started on ideas the jurors had before the case started. He said he heard two jurors tell the Judge that they were opposed to Communism during the examination. He said that no secret ballots were taken, so everyone knew how each juror voted. He said some of the jurors said the Government wouldn't bring the charge if it wasn't true. He said

that at some time he heard it said that if the defendants weren't convicted it would affect Hawaii's getting statehood. He said that the jurors on the side of the Government said that anybody who was a member of the Communist Party must know what its purposes are and are guilty.

" 'He said that the jury wanted Kawano's testimony. He said that jurors on the defense side asked for Kawano's testimony to show that none of the defendants ever talked about overthrowing or destroying the government.

" 'He said that a juror said a number of times during the deliberations that he had to go to the Mainland and that they should get it over with.

" 'He said that if he voted for the defendants he was afraid the other jurors would tell about it and it would hurt his family. He said one of the jurors played cards in the jury room. He said that there was anger and shouting in the jury room between the persons who were for the prosecution and those who were for the defense. Particularly the jurors for the prosecution got angry with the ones who were holding out.

" 'He said they didn't take any secret ballot, but anybody on the defendants' side had to speak up and then the others would try to get them to back down. He said that he heard jurors talk about Attorney Gladstein and said he was too smart and that he had defended the Communists in New York and had served a jail sentence. He said that he heard some of the jurors talk about the war against Communism. He said that they didn't consider the character evidence for the defendants.

" 'He said the second thing the jury decided was that all defendants were members of the Communist Party. The next thing they decided

was that if they were Communists they must have intended to overthrow the government. He said that he himself did not believe Kawano and he heard others say they did not believe Muller. He said that after they asked for the instructions they used the one which told them to decide first whether there was a conspiracy, and right off they decided there was, and then talked about whether defendants were members of the Communist Party. He said there was a lot of talk about Bailey.

" 'After this conversation took place, when Jack Hall and I started to leave, Mr. Fuller begged Mr. Hall not to leave and raised his hands above his head and appeared to be praying although the words were not audible. Before leaving, Mr. Hall tried to quiet Mr. Fuller and helped Mrs. Fuller put her husband in bed.

" 'Mr. Hall and I again went to see Mr. Fuller on Sunday, June 28, shortly after 1:00 o'clock in the afternoon. We were accompanied on this occasion by Joseph Kealalio. When we arrived, Mr. Fuller was sitting in a chair in the living room. He kept looking at Mr. Hall but did not speak.

" 'After conversing with Mrs. Fuller for a very short period of time, we came to the conclusion that it would be better to wait until Mr. Fuller was in better physical and mental condition.

" 'When Mr. Hall started to leave, Mr. Fuller again pleaded with him not to leave.

" 'Further affiant saith not.

" '/s/ Harriet Bouslog.

" 'Subscribed and sworn to before me this 1st day of July, 1953.

" '[Seal] /s/ J. D. Marques,
" 'Notary Public, First Judicial Circuit, Territory of Hawaii.

" 'My commission expires July 15/53.' "

"The Complainant Bar Association neither affirms nor denies the truth or falsity of the allegations and facts contained in the affidavit filed by the Licensee Harriet Bouslog. The Complainant informs the Committee that the above-recited affidavit, its contents, and the manner in which it was obtained furnishes the basis for the charge against the Licensee Harriet Bouslog and that the Complainant will introduce evidence in elaboration of and in corroboration of the charge indicating a failure by the Licensee Harriet Bouslog to comply with standards of professional conduct required of practitioners before this Court and which unprofessional and unethical conduct is condemned in Opinion 109 issued March 10, 1934, by the Committee on Professional Ethics and Grievances by the American Bar Association and by Judge Prettyman in the case of Rakes v. United States, [4 Cir.] 169 F.2d [739] at pages 745 and 746 and other related cases."

The committee's hearing commenced on November 24, 1954, and after several adjourned sessions was concluded on December 8, 1954. The committee's report was signed on June 9, 1955, and filed on July 1, 1955. The findings sustained the charges. (This report is hereinafter set forth as Appendix A.) The Supreme Court forthwith issued an order to show cause to Mrs. Sawyer.

After a return on the order to show cause, the Supreme Court determined that the hearing before it should be one de novo. However, it was stipulated that the court should make its determination on the record before the committee. No new evidence was received and that court saw no witnesses as such. The court on April 6, 1956, sustained the charges and entered judgment the same day. The judgment suspended Mrs. Sawyer from practice for the period of one year. The judgment has not yet be-

come effective.[7] The Supreme Court's opinion is reported at 41 Haw. 270. Express reference is made to that decision. Therein many of the procedural events are listed which are not herein listed.[8]

Now, what did Mrs. Sawyer do and say at Honokaa and what did she do when she took and presented her affidavit to the U. S. District Court for the District of Hawaii? The Supreme Court hearing the case on the written record had the same record for investigation as we do; no more. No intendments can be given it on the ground it heard and saw the witnesses in person. But still the record tells a story and a clear story that overwhelmingly preponderates to sustain the charges.

On the Honokaa meeting we quote the newspaper article written by the reporter Yoshio Matsuoka in the next edition of the Hilo Tribune-Herald, a newspaper published at Hilo on the Island of Hawaii. We do not suggest that the respondent is to be disciplined because of or for a newspaper article. However, she might have expected her remarks were such as would be publicized. The reason we quote the story from the newspaper is that the findings of both the committee and the Supreme Court implicitly sustain the accuracy of the published item. So far as applicable to Hall and Mrs. Sawyer, it reads as follows:

"Smith Act trials are aimed at destroying unions and 'must be stopped,' Jack W. Hall and Harriet Bouslog Sawyer asserted here yesterday.

"Mr. Hall, ILWU regional director now on trial on Smith Act charges and Mrs. Sawyer, an ILWU attorney, addressed an estimated 250 persons in the People's theater.

"Sponsored by the ILWU unity defense committee, it was one of a planned series of such meetings to tell communities the 'true facts' of the cases since sponsors alleged newspapers cannot be depended upon to tell the facts.

"Mr. Hall, speaking for 15 minutes, claimed it was the opinion of the working press in the trial that if the trial were stopped now, the defendants would be acquitted.

"He declared the prosecution has presented no evidence against the defendants in six weeeks of trial and quoted unnamed 'reporters' as saying 'if this is all the government has, what kind of case is this?'

"No jury in the islands would convict on such evidence, he said, and added he was 'certain' there are 'some courageous people' in the jury.

"He characterized some of the 'things that go on' at the trial as 'unbelievable' and 'frightening.' He said such trials 'can be stopped and have to be stopped' to halt further 'scare prosecution directed against our union and its members.'

"Mrs. Sawyer, speaking for a half hour, spoke of 'some rather shocking and horrible things that go on at the trial.'

"There's 'no such thing as a fair trial in a Smith act case,' she charged. 'All rules of evidence have to be scrapped or the government can't make a case.'

"They 'just make up the rules as they go along,' she told her listeners.

"'Unless we stop the Smith act trial in its tracks here' there will be a 'new crime,' that of knowing

7. A division of this Court, Circuit Judge Lemmon dissenting, on May 23, 1956, granted a stay pending the outcome of the appeal herein.

8. That court's opinion, which is supported by the record, shows that at every step of the proceedings Mrs. Sawyer was accorded procedural due process. To in-

quire into procedural due process may well be the limit of the scope of any review that this court of appeals is entitled to make on this type of an appeal. Indeed, one finds in appellant's specifications of error a canting of them in the language of procedural due process, as if counsel were well aware of this possibility.

what's in books and will lead to 'dark ages of thought control,' asserted the chic and attractive woman lawyer.

"She referred to reading by the prosecution of books 'supposed to have been in a duffel bag' owned by a witness, Henry Johnson. She urged her listeners to tell others 'what a vicious thing the Smith Act is.' Persons are 'tried for books written years ago' by others, she said.

"Mr. Hall said Mr. Johnson was a witness 'just so the government can read a bunch of books.'"

■ As witnesses, the bar association presented the newspaper reporter and seven other people who were in the audience. Matsuoka had not his original notes of the meeting but did have an expanded version he had made within a few days after the incident from his original notes at the request of the newspaper's editor. These notes were admissible as recorded past recollection. (The notes are set forth as Appendix B.) The association's witnesses from the general audience seem to have been timid and of course there had been a period of 23 months between the incident and their testimony. These people did not impeach Matsuoka, but substantially corroborated him. The meeting was largely made up of persons in the I.L.W.U. with which organization Mrs. Sawyer was closely associated. We find great significance in the fact that she produced not a single member of the audience to confirm her version. Of the eight other speakers, she brought only the defendant Jack Wayne Hall to testify in her behalf. We think it is not to oversimplify if we say the substance of the testimony of Hall and Mrs. Sawyer as to the event of Honokaa was that her speech was just generalities, a shotgun attack on the Smith Act in general. Generally, the two were very evasive.

Hall's explanation was most suave but is unconvincing even on paper. If their versions were accepted, their speeches were strictly professorial or something like that of a Sunday School teacher explaining to her class what they would see just before she took the class into a courtroom.

It seems clear enough that she said at Honokaa:

1. That horrible and shocking things were going on at the current Smith Act trial in Honolulu.

2. That the trial was not a fair one.

3. That "they" just made up the rules as "they" went along.

4. That unless the Smith Act trial at Honolulu was stopped in its tracks there would be a new crime—people will be charged with knowing what is included in books.

With great deftness Mrs. Sawyer's counsel interweave the defense versions of the testimony into the bar association's evidence pointing the other way. They argue that her talk was just general, couldn't have been anything else, and specifically did not refer to the trial before Judge Wiig or to Judge Wiig.[9] Without quoting the record extensively, we say the short way (but not the only way) to negative this contention is to quote a statement (during the course of the hearings) by Mr. J. Garner Anthony, able counsel who represented her before the committee:

"Mr. Anthony. I will say to the Committee right now—I have read these speeches and I would agree with the conclusion implicit in Mr. Dodge's question, namely that this was a talk about what was going on in the Smith Act trial here in Honolulu. Now let's not fool ourselves about that. We're lawyers here."

In context, when Mr. Anthony says, "This was a talk," he was referring to the Honokaa speech.

9. Counsel for respondent in their reply brief insist they don't dispute that Mrs. Sawyer spoke at Honokaa concerning the Honolulu trial. But a fair characterization of the opening brief is that it says, "Mrs Sawyer didn't really say much about the Honolulu trial, and that was of no consequence."

■ It is quite true that Mrs. Sawyer's harsh comments did not incorporate Judge Wiig by name. On this circumstance the respondent relies heavily. But there is a totality about a trial, a unit of the judicial process, which is entitled to protection from those who get their license from a judicial temple, especially those who are engaged in the particular trial. During its progress the courtroom is the only proper forum for a lawyer to vindicate his clients. We cannot accept the plea that Judge Wiig was not called by name or identified as thin and six-feet-four. Such a thought is really one that the judge's person, not what he represents, is entitled to protection.

Far different is this from the contempt cases of the Times-Mirror with its editorials and Bridges with his telegram.[10] This is not a contempt case. The Times and Bridges were not court officers charged with the duty of keeping the temple clean. Nor was this a case of a lawyer unconnected with the case commenting at a public meeting or a lawyer who had carried his case past the point of decision, now carrying his cause to the people. Nor was it private grousing among friends to which we assume all lawyers are entitled when legal events are not going their way. It was a public meeting.

We reject the clear and present danger rule of third party contempts which is called upon in Bridges v. State of California. How could we accept the notion that before a lawyer in the very same case could be disciplined his voice would have to rise to a mighty cacophony reaching the point of causing the audience (a clear and present danger) to march on the courthouse, or to set up such a howl that the judge would be terrified? Maybe for others, but not for counsel of record.

Nor is this a case of a lawyer under strain making an ill-advised speech who later in calmer moments appreciates his error and is humble about it. Respondent is adamant that she only exercised her constitutional right. So, on that she stands or falls. In our view, she falls.

Seriatim we note respondent's points:

1. The specification that Territorial Statute (Section 9701, Re.Laws Hawaii 1945) was applied by the court below,[11] so as to deprive appellant of liberty and property without due process of law.

(a) The findings and conclusions are wholly without evidentiary support and unreasonable inferences from the evidence.

(b) Respondent was arbitrarily singled out and adjudged by standards of misconduct other than the usual accepted standards of American Law.

(c) Respondent was arbitrarily singled out and adjudged by standards of proof other than the usual and accepted standards of clear and convincing evidence.

■ As to this point, with its three subdivisions, our idea is that, respondent's present view of the evidence just isn't correct. And upon her view of the evidence her challenge rests. Respondent overly dissects the evidence and puts too innocent a gloss on it. We find the evidence as a whole amply and adequately justifies the findings and conclusions. We see no evidence that respondent was arbitrarily singled out.

---

10. Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192.

11. "Sec. 9701. Qualifications. The Supreme Court shall have the power to examine, admit and reinstate as practitioners in the courts of record such persons of good moral character who are citizens of the United States of America, * * * and [who] have taken the prescribed oath of office, as it may find qualified for that purpose; [but no person shall be examined, admitted or reinstated unless he is qualified under the Hawaiian Organic Act to vote in the Territory of Hawaii and shall have actually registered as such voter;] and the supreme court shall have the sole power to revoke or suspend the license of any such practitioners or to dismiss or suspend them from the roll of practitioners for malpractice, fraud, deceit or other gross misconduct."

On subdivision (b) of the point respondent quotes Circuit Judge Soper in In re Ades, D.C.Md., 6 F.Supp. 467, at page 481, as follows:

"An attorney does not surrender, in assuming the important place accorded to him in the administration of justice, his right as a citizen to criticize the decisions of the courts in a fair and respectful manner, and the independence of the bar, as well as of the judiciary, has always been encouraged by the courts."

Also, Ex parte Steinman, 95 Pa. 220, 238, 40 Am.Rep. 637, is quoted:

"Because a man is a member of the bar, the court will not, under the guise of disciplinary proceedings, deprive him of any part of that freedom of speech which he possesses as a citizen. The acts and decisions of the courts of this state, in cases that have reached final determination, are not exempt from fair and honest comment and criticism. It is only when an attorney transcends the limits of legitimate criticism that he will be held responsible for an abuse of his liberty of speech. We will understand that an independent bar, as well as an independent court, is always a vigilant defender of civil rights." In re Troy, 43 R.I. 279, 291, 111 A. 723, 727–728.

These cases themselves turn on respondent. Note that Judge Soper says an attorney has the right to criticize "the decisions" of the courts in "a fair and respectful manner." Note that Ex parte Steinman [12] says, "The acts and decisions of the courts of this state in cases that have reached final determination, are not exempt from fair and honest comment and criticism." This subdivision (b) falls entirely when one reaches the conclusion that the comment was unseemly and certainly at the wrong time.

As to subdivision (c), respondent relies heavily, among other things, upon statements of Professor Rodell of the Yale Law School and again upon her most favorable view of the evidence. We would uphold Professor Rodell's right to say from his Yale vantage point just about what he wants to say. But when he speaks he is not simultaneously harassing the very court in which he is trying an unfinished case. Remove respondent's innocent view of the evidence and again the point is without significance.

2. The point that "the statute, inherently and as applied, without appropriate standards, deprives petitioner of freedom of expression contrary to the provisions of the First and Fifth Amendments. So construed and applied, the statute in operation and effect creates a prior restraint and censorial control over the public utterances of lawyers in derogation of the independence of the bar and the due administration of justice."

We are not familiar with any law that requires a statute for the discipline of lawyers to categorize in detail the lawyer canons. Further, we see no contravention of the First and Fifth Amendments. When one concludes that during the trial the lawyer of record is under restraints not applicable to the public in general, and perhaps not even applicable to the defendant, the point is answered.

The sub-point listed on the Sixth Amendment: "To have (that is, a defendant) the Assistance of Counsel for his defense," we hold has no merit. To be fearless, is not to lay down by night a barrage on the court. Such conduct is the antithesis of bravery or "the Assistance of Counsel." The Sixth Amendment does not say such counsel can be entirely uninhibited. Here again on this point (2) respondent's own view of the evidence is the projection from which the respondent makes her argument.

3. The third point is: "The judgment of the territorial court was beyond its jurisdiction and contrary to sound policy governing the relations between local and federal courts because it creates a standard of conduct intimately affecting the administration of justice in the latter. In reviewing that judgment

12. Cf. In re Breen, 30 Nev. 164, 93 P. 997, 17 L.R.A.,N.S., 572.

this court will make its own evaluation of the facts and determine its own standard."

In short, the point says: Whatever Mrs. Sawyer did was none of the business of the territorial court because the conduct concerned the federal court. But the state (here the territory) is the primary jurisdiction that sponsors a lawyer, that mainly presents him to the public. It has an interest. Even had the conduct been in open federal court, still the state has an interest. See In re Isserman, 9 N.J. 269, 87 A.2d 903. Cases may arise like the Isserman type in which the state will feel it should stand by and let the matter be entirely handled on the federal side of the street. But that lends no support for an argument that we should say a state or territory cannot act. Rather should the territory be commended than chided.

Point five is that the judgment of the Territorial Supreme Court is arbitrary and excessive. This last point must necessarily assume that the conduct was relatively innocuous. Respondent was an officer of the court. The term has vitality and is not a transparent euphemism.

In all facets of this case in this court there has been the spectre of jurisdiction. This court does not have general jurisdiction to review the work of the territorial courts of Hawaii.[13] Our only scope is narrowly defined by statute. We do not have the plenary powers here that we might naturally have in such cases as Lavine's (In re Los Angeles County Pioneer Society) 9 Cir., 217 F.2d 190.

If we have the jurisdiction it hangs by the narrowest thread. We think on the line of such cases as Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, and Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810,[14] when the charge is made that respondent has been deprived of due process of law under the fifth amendment and that the result impinges on her rights under the first amendment, we are justified in taking the case to look at it to see if the claims of such deprivation have any validity. In that sense we have jurisdiction. Then we take the case and, in our view, we find that there was no deprivation of constitutional rights. Thus we complete the chain, and one can then logically argue: therefore we never had jurisdiction.[15] On the whole, after examining the record it is our view that the respondent's position basically has little right to be more than a claim that the territorial court took a different view of the evidence than hers and the judgment is a little too harsh. Such claims we wouldn't hear. So, within the limits of permissible advocacy, we suppose, we find the claims on appeal expanded to include claims of deprivation of constitutional rights, claims which we hold are not solid.

On the second segment of the case, the Fuller affidavit, Mrs. Sawyer's counsel meet it by ignoring it completely in their opening brief. Finally, in their closing brief they say that it is moot because the Supreme Court imposed no punishment thereon. As to that point, we cannot agree. The court at page 425 of its opinion in 41 Hawaii reports (having first announced the suspension of one year in consequence of the Honokaa speech) then proceeded to the matters incident to the Fuller affidavit and finally concluded with:

13. See 28 U.S.C.A. § 1293.
 "Final decision of Puerto Rico and Hawaii Supreme Courts
 "The courts of appeals for the First and Ninth Circuits shall have jurisdiction of appeals from all final decisions of the supreme courts of Puerto Rico and Hawaii, respectively in all cases involving the Constitution, laws or treaties of the United States or any authority exercised thereunder, in all habeas corpus proceedings, and in all other civil cases when the value in controversy exceeds $5,000, exclusive of interest and costs."

14. Cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939.

15. Cf. Theard v. United States, 354 U.S. 278, 281, 77 S.Ct. 1274, 1 L.Ed.2d 1342.

"However, in the instant matter, this court will let its hereinbefore expressed disciplinary order suspending the said respondent licensee from the practice in the territorial courts for one year and requiring her to pay costs—suffice, although also deeming gross misconduct her said repeated interviews with and interrogations of David Fuller."

To us, this is a statement that the penalty for the two charges is imposed concurrently—the same penalty for both charges. However, there is a tinge in the pronouncement which possibly indicates that had the Fuller charge been before it alone it might have not imposed a full year's suspension on that charge; we do not know. If we were reversing the case on the findings and penalty on the first charge, we would (because the matter is not clear) refer the matter back to the territorial court to determine clearly and anew what sanction it intended to apply on the second charge.

 The evidence sustains the second charge as appears from the findings of the court's committee and the court itself to which reference is made. It is quite evident, however, that on the second charge alone the respondent would not be able to maintain intact, without breaking, the very thin thread on which we have held there are points which give us the jurisdiction to test the record.

Appellant contends that her punishment applies a different standard to her than has been applied to other lawyers in Territory and that the penalty is too severe; that instead of automatic reinstatement at the end of a year she will have to apply anew—be investigated and take the regular bar examination. Circuit Judge McKinley, sitting pro tem on the Supreme Court, voted for disbar-

ment. That would have been permissible, we think. Many disbarred attorneys become reoriented and again make their way back into the bar.

If the respondent should show some genuine remorse and some appreciation of her error, it might be that the Supreme Court of Hawaii would ameliorate its decision. But so long as she conceives that she has a right to litigate in a given case by day and castigate by night (or at recess) the very court, the honored place in which she is working, berating the conduct of the trial which she will resume on the morrow, she does not deserve to practice law.[16]

We find applicable here much that is said in In re Howell, 10 N.J. 139, 89 A.2d 652, 653. There Attorney Howell under great provocation by a newspaper editor sought the editor out and severely beat him with both a riding crop and a rubber hose. This was conduct far removed from litigation. The court, per curiam, quotes Canon 29 of the Canons of Professional Ethics of the American Bar Association to the effect that a lawyer should "strive at all times to uphold the honor and maintain the dignity of the profession and to improve not only the law but the administration of justice." The court continued, "An attorney's responsibility is to the courts, the profession and the public, and his misconduct may be of such a nature as to engender disrespect for the law which is his basic trust."

Mr. Justice Brennan, then of the Supreme Court of New Jersey and now of the Supreme Court of the United States, wrote a concurring opinion in the Howell case in which Chief Justice Vanderbilt joined. In it he said,

"We are a society governed by law, whose integrity it is the lawyer's special role to guard and cham-

---

16. Mr. Justice Cardozo when on the New York Court of Appeals said, "Membership in the bar is a privilege burdened with conditions. Matter of Rouss, supra 221 N.Y. [81], at page 84, 116 N.E. 782. The appellant was received into the ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." People ex rel. Karlin v. Culkin, 248 N.Y. 465, 162 N.E. 487, 489, 60 A.L.R. 851.

pion. In that society there is no place for a personal code of justice. The preamble to the Canons of Professional Ethics observes 'The future of the Republic, to a great extent, depends upon our maintenance of Justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just men.' Canon 29 obligates every member of the bar to 'strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice.' * * * His office is a very badge of respectability and his conduct sullies the office. He 'invites and merits stern and just comdemnation.' Cf. Canon 32. His conduct perforce imperils not him alone but the honor and integrity of his profession which depends for its very existence upon public trust and confidence.' * * * Discipline must be imposed not primarily to punish him but to give assurance to the public that the profession is deserving of its trust and confidence and will demand that all lawyers meticulously adhere to the high standards imposed by the profession upon itself."

It is true that Lawyer Howell had entered a *non vult* or *nolo contendere* plea in a trial court to a charge of simple assault and battery; thus the doing of a criminal act was implicitly conceded. But we would think simple assault and battery was a crime not involving moral turpitude per se. The New Jersey Supreme Court had to go on and examine de novo the special facts of the case, and it did.

Here in Mrs. Sawyer's case the Supreme Court's findings bring us to the same point: she did that with which she was charged. And it should be noted

that Howell was abject in admitting his error. Notwithstanding his contrition, the court suspended him from the practice of his profession for six months.

Mrs. Sawyer's conduct has neither the ameliorating circumstance of Howell's rage being instantaneous with perhaps great provocation (and, with only 40 minutes to cool down), nor of his later recognition of his error.

 We agree that the censured conduct of respondent was grossly improper.

Judgment affirmed.[17]

### Appendix A

### Report of Legal Ethics Committee

To the Honorable Chief Justice and Associate Justices of the Supreme Court of the Territory of Hawaii:

The Legal Ethics Committee, pursuant to a letter from the Honorable Edward A. Towse, dated July 8, 1954, has investigated a complaint filed by the Bar Association of Hawaii and makes this report of the charges, facts and conclusions of the Committee pursuant to Rule 19.

The Charges:

The two charges made in this complaint have to do with (1) the alleged improper conduct of Mrs. Harriet Bouslog Sawyer, referred to in this report as "Mrs. Bouslog," in making a speech at Honokaa, Hawaii, on December 14, 1952, and (2) the alleged improper conduct in connection with her interview of the juror David P. Fuller, as more fully set forth in the Bill of Particulars dated September 29, 1954.

The Facts:

The Committee finds that Mrs. Bouslog was one of the attorneys appearing for certain defendants in the United States District Court for the District of Hawaii entitled "United States of America, Plaintiff, against Charles Kazuyuki Fujimoto, et als., Defendants," being Criminal 10495 in that Court; that on De-

17. Circuit Judge Denman, then Chief Judge, presided at the oral arguments of the foregoing case heard en banc. Between the date of hearing and the date of decision he retired. He now deems it inappropriate that he participate in the en banc decision. Circuit Judge Lemmon heard the oral arguments, but his death occurred on April 26, 1958.

cember 14, 1952, during the course of the trial, she made a speech at a public gathering at Honokaa, at which she said, among other things, that horrible and shocking things were going on at the trial; that there was no fair trial in the case; that they just made up the rules as they went along; that unless the Smith Act trial was stopped in its tracks in Honolulu there would be a new crime.

With respect to the charges in paragraph III, the Committee finds that after rendition of the verdict in Criminal 10495, mentioned above, Mrs. Bouslog visited one of the jurors, David P. Fuller, Jr., while he was in a very poor mental and physical condition and thereafter submitted her affidavit concerning an interview with the juror to the Presiding Judge.

While the affidavit of Mrs. Bouslog indicates that on the first occasion he was gravely ill, the Committee finds that she did not fully disclose to the Court the condition of Mr. Fuller, nor the fact that she had attempted to get affidavits from Mrs. Fuller, who refused to sign one, and could not get an affidavit from Mr. Fuller because of his condition.

Conclusions and Recommendations:

The Committee is of the unanimous opinion that the Bar Association of Hawaii has sustained the allegations in paragraphs II and III of its complaint and that Mrs. Bouslog, in imputing to the Judge unfairness in the conduct of the trial, in impugning the integrity of the local Federal courts and in other comments made at Honokaa, was guilty of violation of Canons 1 and 22 of the Canons of Professional Ethics of the American Bar Association and should be disciplined for the same.

The Committee is likewise of the unanimous opinion that it was improper for her to submit her affidavit concerning the interview with the juror Fuller to the Presiding Judge under the circumstances under which it was submitted. There are differences of opinion within the Committee as to whether her interviews with juror Fuller were proper, as to whether they were in violation of Canon 23 of the Canons of Ethics and as to whether she should be disciplined, although the majority think she should be disciplined with respect to the charges in paragraph III.

Dated: Honolulu, Hawaii, June 9, 1955.

Respectfully submitted,
/s/ C. Dudley Pratt,
 Chairman;
/s/ Milton Rodes,
/s/ Clifton H. Tracy,
/s/ E. C. Peters,
/s/ [Indistinguishable],
 Of the Legal Ethics
 Committee.

I concur in the findings of the Committee that the conduct of the respondent was, with respect to the Honokaa speech and with respect to the matters concerning the juror, improper.

I do not concur in the conclusion that the other members of the Committee have reached with respect to the recommendations we should make to the Court.

This is a proceeding under Rule 19 of the Rules of the Supreme Court. This Committee's authority to act and its duties are set forth in that Rule.

On completion of the hearing the Committee shall file with the Court its findings of fact, conclusions of law *and recommendations as to action to be taken* by the Court in the matter * * *

I do not believe the italicized words mean only that this Committee should merely recommend that disciplinary action should or should not be taken. I believe that the Rule means that this Committee has a duty to go further and recommend the nature of the discipline it feels is proper.

I would recommend that, for the improper conduct of Mrs. Bouslog with reference to the Honokaa speech, she be suspended from the practice of law for such period of time as the Court may deem just and proper. I believe this to be by far the more serious of the two charges.

I would recommend that, for the conduct regarding the juror which this Committee has found to be improper, she be reprimanded.

Dated: Honolulu, T. H., June 9th, 1955.

/s/ R. G. Dodge.

[Endorsed]: Filed July 1, 1955.

---

Appendix B

Matsuoka's "Notes"

Notes on Mrs. Harriet Bouslog Sawyer's speech at People's theater, Honokaa, Sunday, December 14.

She followed Samuel M. Bento, who said he wanted to say good morning to the Tribune-Herald, pointing generally toward the paper's reporter from Hilo and the paper's Honokaa correspondent who were sitting side by side. Mrs. Sawyer preceded Jack W. Hall. She began speaking at 11 a. m. and ended 11:30 a. m.

---

Notes on what she said in the order of how she proceeded: The trial is really a trial of Jack Hall to which has been added six others. It's to get at the ILWU.

Said she wanted to tell about some rather shocking and horrible things that go on at the trial.

---

She was appointed some years ago (3 or 4 years ago) by a court to defend a man who had no money to hire his own counsel. He was charged with pimping and procuring. The complaining witness in the case was a woman who had been in business 20 years in the territory who claimed she had reformed and repented but this vicious man had driven her back again into the business. It turned out that the hotel where he had kept her had 27 doors unlocked. Likened this to pukas in the Smith act.

Said men in power are trying to put men in jail because of their thoughts. and books written before he was born.

One of the reasons Jack Hall is on trial is because it is said he once got a book, the Communist Manifesto, written in 1898, before Jack Hall was a gleam in his father's eye.

She quoted from manifesto: a spectre is haunting Europe; the spectre is communism. she explained spectre means ghost. said spectre still seems to be haunting people today.

She turned next to conspiracy. noted there was a conspiracy trial in 1937 of filipino brothers. conspiracy to advocate violence and criminal sindicalism. explained conspiracy means agreement. government never has used conspiracy when it had a case. when it hasn't got enough evidence it lumps a number together and says they agreed to do something. the government does not say * * * advocated overthrow but says they agreed to. conspiracy means to charge a lot of people for agreeing to do something you have never done.

---

touched on myth of agents of fbi. they're supposed to be extra special. radio programs, movies, publicity tell how wonderful they are. but when you see hundreds of tax fraud cases go by and when they spend most of their time investigating people's minds it's time to cut them down to size. said she had told this to a honolulu gathering. labor day? fbi agents should be called federal cops. said has slogan: put away your thoughts here come the federal cops. cops push people around.

---

paul crouch. difficult to understand why he's witness. but he was here in 1924; because he was once in Hawaii, so guess that's why. he testified what he did in russia in 1927. he told what he was told by generals etc. usually you cannot testify on what people told you when there is no chance for those to be cross examined.

206

aileen fujimoto was four years old then. what has crouch's galloping over the plains of russia got any bearing on her. jack hall was 13. but the government goes on with testimony for two weeks on what crouch did between 1927 and 1941 without ever mentioning the defendants.

he told of infiltration of the armed forces and plots . . . it used to be the idea that a man is responsible for what he did and said—not what someone else did. not a single one of the defendants was of age at the time he's talking about. the jury is not going to pay attention to what Crouch says. but it's the old smear. The prosecution says crouch did this and that and we (prosecution) say the defendants are communist party members so they must have done the same.

but government propaganda has been going on for 10 years

before the jurors went into the jury box.

it's enough to say a person is a communist to cook his goose.

the government says there was an agreement to violate the smith act which was passed in 1940. then the defendants agreed to violate it before it was passed. crouch said he was at a communist meeting in 1941 and saw five or six people there. it was the first time he'd seen them. but he was satisfied when he came to honolulu 12 years later that one was Koji Ariyoshi. she urged audience try to recall what they did 12 years ago. said she can't recall details. god knows no one has a memory that good. yet they use this kind of testimony.

why? because they will do anything and everything necessary to convict.

some of the witnesses testified differently from what they testified previously. the government knows this but deliberately goes ahead and have him say things in order to convict. mentioned izuka in reinecke trial testimony. said something about izuka saying he didn't know the party advocated overthrow of government until he got out of party.

witnesses testify what government tells them to. just as they read portions of books like overthrow the government and leave out the rest which says czarist government showing it dealt with russia.

johnson testimony. said he came back from san francisco with communist books and literature in a duffle bag. he said when he got to Honolulu he told Jack Hall the names of some of the books. then the government for two days reads from books supposed to have been in the duffel bag. they're not dealing with what jack hall said. on cross examination johnson said he did not tell the names of the books but just showed jack hall the duffel bag. so jack hall violated the smith act because he saw a duffel bag with some books on overthrowing the government in it. it's silly. why does the government use your money and mine to put people in jail for thoughts

the government has carried on a barrage of propaganda for many years and expects people in the jury to have hysteria just hearing about communism is enough to jail. said has a friend who worked for sears roebuck and has family of three children and wife. he made a terrible mistake one time. in 1941 he lived in the same house as jack hall. the fbi wanted him to testify. he said i feel jack hall is one of the finest people i have known. apparently the fbi didn't like this. so they suggested to sears and roebuck to fire him because he wouldn't cooperate with the government.

he wasn't fired so they went to the Los Angeles and Chicago offices of sears and roebuck and convinced them he had to be fired. he was fired because he refused to be a stool pigeon and informer. the government gets away with it by making people fear that if they don't do as it

wants they'll be branded red and lose their jobs.

there's no such thing as a fair trial in a smith act case. all rules of evidence have to be scrapped or the government can't make a case.

referred to her habeas corpus move in the palakiko—majors case (Palakiki v. Harper, 9 Cir., 209 F.2d 75).

---

said a woman came to her with report she heard vernon stevens say he beat a confession out of one of them. she testified but the supreme court refused to let the evidence in because vernon stevens was not here and had no chance to deny this. with the same situation a federal judge sitting on a federal bench permits crouch to testify about 27 years ago. what was said then. in the previous case it was the life and death of one. and yet here they permit a witness to tell what was said when a defendant was five years old.

---

there's no fair trial in the case. they just make up the rules as they go along. the first smith act case was in 1949 of the new york top leaders, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. attorneys contended they should have the right to say what they did from 1924. medina permitted them to say what the defendants themselves did from 1934 on. but the government can't make a case if it tells just what they did so they widened the rules and tell what other people did years ago, including everything including the kitchen sink.

unless we stop the smith trial in its tracks here there will be a new crime. people will be charged with knowing what is included in books. ideas.

---

mentioned los angeles trial in which someone said there was no evidence that someone had instructed persons not to read some books.

said there'll come a time when the only thing to do is to keep your children from learning how to read. then not only will unions be destroyed but so will freedom of thoughts and action. there'll be dark ages of thought control when people won't be able to speak freely in taverns and other places.

she urged audience to go out and explain what a vicious thing the smith act is. people are tried for books written years ago.

### Appendix C

#### The Sawyer Explanation to District Judge Wiig

Extract from Transcript of Proceedings in United States v. Fujimoto.

#### Afternoon Session—December 16, 1952

---

(The Court convened at 1:15 p. m.)

(Jury absent.)

The Court: Mrs. Bouslog, when were you admitted to practice in this Court?

Mrs. Bouslog: In the year 1941, your Honor.

The Court: Do you remember the date?

Mrs. Bouslog: The certificate, your Honor, hangs in my office, but I believe it was some time in December in 1941. I was notified that I had passed the bar examination in the Territory, as I recall, after Pearl Harbor. So I believe it was the latter part of December in the year 1941.

The Court: I have before me a newspaper clipping from the Honolulu Star Bulletin of Yesterday afternoon in which it purports to quote statements made by you on December 14, 1952, at Honokaa, Hawaii, at a meeting. Do you have anything to say as to the newspaper report?

Mrs. Bouslog: I do indeed, your Honor. I want to say that I welcome the opportunity to state to the Court the substance of what was said at that meeting, and I assure your Honor that the ex-

cerpts wrested from the context will not reflect the substance of the context of that speech. Of the words, attributed to me in quotes, I recall clearly that I did say, 'There is no such thing as a fair trial in a Smith Act case.' I explained, your Honor, the reason for that statement. The reason, I said, was that ideas and books are on trial in a Smith Act case, and that years of propaganda which preceded the enforcement of the Smith Act both by the Government and by the Commercial press has created such an atmosphere of hysteria that the very word "Communism" has become such a deadly label that it is almost impossible for jurors to put out of their minds all they have read and heard outside the courtroom. In substance, your Honor, I said in respect to this statement no more than defense counsel said in the motion on file before this Court for a transfer of the place of trial. In substance, I said no more than what Justices Black and Douglas, dissenting, said concerning the Smith Act in the Dennis case (Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137).

The balance of the words other than the ones I have just quoted—which I recall clearly having said—the balance of the words attributed to me in quotes, either I did not say or they are so torn from context as to wholly distort my speech as a whole. Apparently Mr. Walsh is not satisfied to try my clients on sentences or parts of paragraphs ripped from context but he desires to try me on sentences, on portions of sentences and words extracted from the context in which they were said. This, I am sure, that this Court will not permit.

My speech was extemporaneous, an extemporaneous speech, your Honor. I have no notes as to the exact words or the full content. Upon learning, however, this morning from my colleagues that your Honor was going to give me an opportunity to state the substance of the remarks which I did make, I dictated to my secretary the substance of the speech.

I began my remarks by explaining what the Smith Act is and how the prosecution goes about trying a Smith Act case, reading excerpts from books that were written many years before the defendants in this case were born. I spoke of the difference between a Smith Act case and the ordinary criminal case in which a person is tried for what he has done, not for what he thinks—what is in his mind. I explained what a conspiracy is and showed how it can be used to charge a group of persons with agreeing to do what the prosecution cannot prove any single individual did.

In this respect, your Honor, my explanation was drawn from the criticism of the Senior Circuit Judges of conspiracy charges which we cited to your Honor in the brief which we filed and indeed quoted the language of the Supreme Court itself on conspiracy and calling it a dragnet.

My remarks at the meeting at Honokaa concerning the rules of evidence were directed towards the conduct of the prosecuting attorneys in Smith Act cases, how they use a conspiracy charge for the very reason that it permits them to introduce evidence that would not be admissible under the ordinary criminal charge.

I said that in Smith Act conspiracy cases the prosecution had gone beyond the scope of the rules of evidence, even in other conspiracy cases. My remarks were no more in substance than has been stated to this Court in the memorandum filed by defense counsel, submitted in support of the motion to strike the entire testimony of the witness Crouch. In fact, your Honor, my objective in the speech at Honokaa was to state in ordinary language that laymen would understand the content of the decisions of the courts cited in that brief.

The second half of my speech—after speaking generally concerning the tactics of the prosecution in the Smith Act cases and the Smith Act—was devoted to a discussion of the evidence on which the prosecution in this case is seeking to convict Jack Hall and the other six defendants in this case. I used several illustrations. One, I used the testimony of Paul

Crouch about riding horses on the Russian plains and talking to a Russian general in 1927. I pointed out the defendants couldn't have possibly cross-examined the Russian general, first, because he had been dead for many years, and second, even if he weren't it would probably be impossible since he is a Russian. I pointed out at the time that Paul Crouch was in Russia, Eileen Fujimoto was five years old and Jack Hall, aged thirteen, was just ready to start high school in Southern California. Yet I said Crouch's testimony of his plotting to infiltrate the Armed Forces and to commit acts of espionage and sabotage while in Russia in the year 1927 was being used against the defendants in this case.

Another illustration that I used from this trial was the testimony of Henry Johnson who testified that some time in 1945 or 1946 he showed Jack Hall a duffle bag and told him it contained Marxist literature. That, although Johnson admitted on cross-examination that he didn't tell Jack Hall what books the duffle bag contained, in effect the fact that Jack Hall had seen the duffle bag was used as a basis for introducing numerous books in evidence which Johnson testified the duffle bag contained.

Another illustration I used was that of the testimony of Ichiro Izuka who testified under oath in the Reinecke case that he didn't learn until after he left the Communist Party that it advocated the use of force and violence, and that therefore his testimony was of no value to the prosecution to prove the crime charged against these defendants but that nevertheless the prosecution called him and used him in this case to testify to matters completely at variance with his sworn testimony in prior cases.

To illustrate the difference between the application of the rules of evidence in ordinary cases and in Smith Act cases, I told how the Supreme Court of the Territory of Hawaii had refused in the Palakiko and Majors case which involved a question of life and death to permit the testimony of Mrs. Frances Hughes of an admission by Detective Vernal Stevens that he had struck Palakiko before he obtained his statement on the technical ground that no foundation was laid because Vernal Stevens was out of the Territory.

Yet in Smith Act cases I pointed out the prosecution puts on witnesses to testify to things that were said and done by third persons not only on the mainland of the United States but in other countries halfway around the world, and even though the defendants here do not know, have never had any contact with the third persons mentioned and never heard of them before this trial.

I closed my case or my speech by saying that a new crime is being created, the crime of reading. I quoted exactly from, to the best of my recollection, from the closing argument to the jury by the prosecution in the Los Angeles case, in which the prosecution said the defendants asked people to read, read, read, and that they never at any time told people not to read anything. I said that if Smith Act prosecutions continue, the only safe thing will be not to know how to read. And that Smith Act prosecutions, unless stopped, will lead to thought control. I said further that the Smith Act can be stopped here in Hawaii if enough people began to understand the danger of such prosecution.

As the Court can see, my remarks were directed towards the conduct of the prosecution and were not directed towards the Court. By that I do not mean to say that the defense counsel in any way recede from the position that was taken in the brief filed in connection with the Crouch testimony, in which we believe we have cited authorities showing that your Honor had admitted evidence which is not admissible even in the ordinary conspiracy case.

I feel, your Honor, that when the words—and you will note in some cases they are single words—are put back into the context of the whole speech that it must be clear to your Honor that there was no contempt of this Court involved in the speech and that the criticism was di-

rected to the conduct of the prosecution in Smith Act cases.

The Court: Before you sit down, I would like to ask you, did you say at that meeting that things go on at the trial, referring to this trial, that are unbelievable and—

Mrs. Bouslog: No, your Honor, that was not even attributed to me, I believe. That, I believe was not attributed to me even in the newspaper account.

The Court: Did you say that some rather shocking and horrible things were going on in this trial?

Mrs. Bouslog: I have no recollection of that statement. I did undertake to explain in factual terms exact testimony that has taken place in this case, of which I gave the four illustrations which I have cited to your Honor. I have no recollection of those words.

The Court: Did you say that all rules of evidence have to be scrapped or the government can't make a case and just make up the rules as they go along, or words to that effect?

Mrs. Bouslog: No, your Honor. I explained in the substance of my speech that I paraphrased for the laymen the rules of evidence contrasted with the kind of offered evidence by the prosecution in Smith Act cases, all of which is set forth in the memorandum to your Honor in which it is shown that there is a great—that the prosecution seeks great leeway from the ordinary rules of evidence.

The Court: You realize that this trial is still pending?

Mrs. Bouslog: Yes, your Honor.

The Court: And has been pending now for six weeks?

Mrs. Bouslog: Yes, your Honor.

The Court: That you are counsel of record?

Mrs. Bouslog: Yes, your Honor. And may I say, your Honor, that I think there is not one word of what I said at Honokaa that is in any way, that in any way shows any contempt for this Court, that my remarks were directed, as I said,

primarily to the conduct of the prosecution in a Smith Act case. And, of course, more learned and more prominent people than I have said much stronger things concerning the techniques of the prosecution in all Smith Act cases beginning with the Dennis case and all of the pending cases. And those remarks in context were directed generally to the Smith Act cases. Only the specific illustrations from this trial related factually to what goes on in this courtroom.

The Court: Well, Mrs. Bouslog, I am not satisfied with your explanations to the Court. I think this matter requires further investigation. I am going to instruct the U. S. Attorney to make a further investigation of this matter and if he finds under the provisions of Rule 42(b) [18 U.S.C.A.], a Notice and Order to Show Cause should issue, then he will do so.

Mrs. Bouslog: I will say to the Court that I am happy to have any investigation made of what I said. I think perhaps that it is rather unfortunate that the Court refers it to the prosecution whose conduct I was criticizing in the case rather than to an impartial person.

The Court: Well, in that respect, Mrs. Bouslog, if you feel that there is any partiality on the part of the U. S. Attorney, I have no reluctance whatsoever to refer the matter to an independent attorney. I think you should know that throughout this trial I have done everything that I could to assure to the defendants a fair trial. Counsel for the defendants naturally have disagreed with me on some of my rulings on evidence. That is only natural. Or the admission of documents in evidence. But in every other matter that has come up since the time the jury was selected, the matter of fair play on giving the defendants the benefit of the doubt, I have almost consistently done so. It is very surprising to me to read this article in the newspaper after one of your associate counsel, Mr. Wirin, took occasion a week or so ago to come to my chambers during a recess and state that he had been advised or had heard—I didn't ask him the source

of his information—that Judge Wiig would not give the defendants a fair trial, and he wanted to state to me at that time that in his opinion the defendants were receiving a fair trial. Again, Mrs. Bouslog, I have done everything I could in this trial to prevent any outside influences from entering into the presentation of evidence and the matters that go to the jury. So when this case is in their hands it will be decided upon the evidence and what has taken place here in the courtroom.

This publication in yesterday afternoon's paper is the first that I have seen which is contrary to what I had hoped for, what I had hoped would continue throughout the trial. The factual reporting of the principal or the Honolulu Advertiser and the Honolulu Star Bulletin had been, I think, fair. I have noticed no editorial comment or other comments which would in any way have an effect upon giving a fair trial to these defendants. And this caused a great deal of concern when it was called to my attention by Mr. Walsh yesterday afternoon. I trust that nothing will happen from here on which will affect this trial in any way. Will you please call the jury?

Mr. Barlow: Am I to understand, your Honor, that I am going ahead with the investigation?

The Court: Yes.

BARNES, Circuit Judge (concurring, in whose concurring opinion Judges HEALY, FEE and CHAMBERS concur).

I agree with Judge CHAMBERS in his holding that the respondent's conduct was grossly improper.

Unquestionably, this Court has jurisdiction in this cause where constitutional objections are raised as to a disbarment proceeding, because the question of according due process of law to the lawyer is always involved. Therefore, this Court has the authority to examine the proceedings. The panel which first heard the cause and now the whole court, with one dissenting judge, agree to this proposition.

■ Due process of law, both substantive and procedural, was accorded. As the opinion of Judge CHAMBERS shows, the Hawaii Bar Association filed with the Supreme Court of Hawaii a complaint against Harriet Bouslog Sawyer, which contained two charges of professional misconduct. Since Mrs. Sawyer was duly and regularly admitted by the Supreme Court, she was an officer of that court and responsible to it for alleged professional misconduct. In accordance with its own Rule 19, that tribunal referred the cause to its Committee on Legal Ethics and Unauthorized Practice for investigation, which required the Bar Association to furnish a bill of particulars. The Committee held several sessions of the hearing and filed a report containing findings sustaining the charges. The Supreme Court issued an order to show cause, which was directed to and served upon Mrs. Sawyer, who filed a return thereto. Thereupon, the Supreme Court held a hearing de novo. Mrs. Sawyer was accorded the right to and did appear at that hearing in person. She was given the opportunity to be heard, and took full advantage of the occasion. Mrs. Sawyer was given the right to be represented by counsel. Eminent and able counsel of unblemished reputation did in fact vigorously represent her.

The record as a whole, at a minimum, shows that there was not only adequate but substantial evidence to sustain a judgment cancelling her license. Furthermore, irrespective of the dissents, we believe the evidence clearly convincing and sufficient to sustain the judgment beyond a reasonable doubt.

The Supreme Court then suspended Mrs. Sawyer from the exercise of her office, which it had conferred upon her "during good behavior," for professional misconduct, ascertained and declared upon adequate and convincing evidence by the judgment of that tribunal after she was afforded opportunity to be heard both personally and by counsel.

█ The Supreme Court of Hawaii is not a court organized under Article III of the Federal Constitution, but rather under Article IV, section 3, clause 2 of that instrument.[1] The power of Congress to restrict or abrogate appellate review from such a tribunal is paramount.[2] There is doubt whether appellate courts organized under Article III can be constitutionally burdened with review of administrative functions or housekeeping regulations or determination of a legislatively controlled tribunal.[3]

█ Even in cases where Congress has permitted review of the territorial Supreme Courts, the appellate courts of the judicial system proceed with extreme caution where local customs, practices or the subtle influences or nuances of customary local law may be present.[4] The same caution should be employed in a parallel situation if local custom of a legislative tribunal dictated that its licentiate should not obstruct the course of justice in another court.

I read the original Matsuoka notes (not the newspaper story thereafter written) as a direct attack upon Judge Wiig's conduct of the trial and his rulings therein; that Mrs. Sawyer charged that "this" was not a fair trial; that Judge Wiig's rulings on evidentiary matters were unfair; that Judge Wiig, with the government prosecutors, "make up the rules as they go along;" that in this case all rules of evidence were "scrapped;" that the conduct of this Smith Act trial was a crime that had to be stopped. How such charges can be characterized as being "devoid of any attack upon Judge Wiig or his Court," or to constitute "not even a scintilla of evidence" of an attack upon the integrity of Judge Wiig, as does my brother, Judge POPE, is beyond my powers of comprehension.

Whether such acts charged to Judge Wiig were "shocking and horrible" is beside the point. Mrs. Sawyer chose to characterize them as such.

To conclude that Mrs. Sawyer was referring to Smith Act cases generally, and to "all Smith Act cases," but was not referring specifically to this one case then on trial, is to my mind nonsense. *Her* attorney at the trial clearly understood "that this was a talk about what was going on in the Smith Act trial here in Honolulu. Now let's not fool ourselves about that. We're lawyers here." Mrs.

1. "* * * the territorial courts are 'legislative' courts, created in virtue of the national sovereignty or under article 4, § 3, cl. 2, of the Constitution * * *." O'Donoghue v. United States, 1933, 289 U.S. 516, 535, 53 S.Ct. 740, 744, 77 L. Ed. 1356; Ex parte Bakelite Corporation, 1929, 279 U.S. 438, 449–450, 49 S.Ct. 411, 73 L.Ed. 789; Mookini v. United States, 1938, 303 U.S. 201, 205, 58 S.Ct. 543, 82 L.Ed. 748.

2. Ex parte Wilder's Steamship Company, 1902, 183 U.S. 545, 22 S.Ct. 225, 46 L.Ed. 321. Jurisdiction of this Court over certain final decisions of the Supreme Court of Hawaii is conferred by 28 U.S.C.A. § 1293.

3. "* * * this 'Constitutional' court * * * is empowered to act only in justiciable 'cases' or 'controversies' within the meaning of Article III of the Constitution, and so has no jurisdiction to review 'administrative or legislative issues or controversies'." Boggess v. Berry Corporation, 9 Cir., 1956, 233 F.2d 389, 392. See also Application of L. B. & W. 4217, 9 Cir., 1956, 238 F.2d 163.

4. Waialua Agricultural Co. v. Christian, 1938, 305 U.S. 91, 108–109, 59 S.Ct. 21, 83 L.Ed. 60; De Castro v. Board of Commissioners, 1944, 322 U.S. 451, 456, 64 S.Ct. 1121, 88 L.Ed. 1384.
 "Our power to reverse rulings of the territorial court on law or fact is limited to cases of manifest error." Pioneer Mill Co. v. Victoria Ward, Limited, 9 Cir., 1946, 158 F.2d 122, 125, certiorari denied 330 U.S. 838, 67 S.Ct. 979, 91 L.Ed. 1285.
 "We must note that our jurisdiction to review the action of the Hawaiian courts * * * is a narrow one. * * * the question is what standards of fundamental fairness * * * are required by the Fifth Amendment, and whether those standards were here complied with." Palakiko v. Territory of Hawaii, 9 Cir., 1951, 188 F.2d 54, 60, certiorari denied sub nom. Palakiko v. Harper, 347 U.S. 956, 74 S.Ct. 683, 98 L.Ed. 1101; Alford v. Territory of Hawaii, 9 Cir., 1953, 205 F.2d 616, 617–618.

Sawyer said: "Unless we stop *the* Smith [Act] trial in *its* tracks *here* there will be *a new crime.*" Mrs. Sawyer was then and there referring to but one Smith Act case; *the* Smith Act case then before Judge Wiig. Any other interpretation flies in the face of reality and renders the English language not understandable.

The point urged by Judge POPE that "Judge Wiig did not rule upon Crouch's testimony until long after the speech," seems to me to compound the offense rather than excuse it. If the court had not yet made its ruling on admissibility, even more reason existed why Mrs. Sawyer should not attempt to influence the court's subsequent order by inflaming her audience outside the courtroom during the trial's progress. This was a criminal trial by jury who were not impounded but were permitted to mingle with the community when the court was not in session. Even customary media of communication are restricted to "fair comment" in reporting the proceedings.

To me this case no more involves "freedom of speech" in its constitutional sense than do the rules of court which permit a judge to require an attorney (whether he represents Smith Act defendants or the government or any other litigant) to take his seat in a courtroom, and to refrain from further statement. An attorney, acting as such during the trial of a case, must be subject to certain restrictions upon what he may say or do. To that extent he has lost a certain freedom of speech, and a certain freedom of conduct. To that extent such loss of freedom is a necessary adjunct to the intelligent and orderly enforcement of all litigants' constitutional rights, including those clients the disciplined attorney represents. The attorney need not give up his complete freedom if he prefers not to act as an officer of the court in the trial of a case. When he purports to so act, whether through preference or in response to duty, unless he is to be bound by the reasonable rules of the court governing all cases tried therein, he advocates that anarchy should rule.

I concur in the affirmance.

POPE, Circuit Judge, with whom HAMLEY, C. J., concurs (dissenting).

I have a very different view of what the facts are in this case. The majority accept the conclusion of the Hawaii court that appellant "engaged and participated in a wilful oral attack upon the administration of justice in and by the said United States District Court for the District of Hawaii and by direct statement and implication impugned the integrity of the judge presiding therein and in the said pending case, * * * * "[1] I am satisfied that there is nothing in the record to support that statement. I think this is one case in which it is peculiarly important that we scrutinize with care the proof as to just what did happen.

If appellant used the precise words and made the exact statements that those who testified against her say she did, there is a serious and substantial question as to whether the judgment below does not violate her rights under the First Amend-

---

[1]. The paragraph in full reads as follows: "Upon its finding and conclusion as stated, supra, this court deems that in saying what she did in her speech to a public gathering at Honokaa, Hawaii, on December 14, 1952, as aforesaid, when there was then pending in the United States District Court for the District of Hawaii a case under the Smith Act, to-wit, the case entitled 'United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et als., Defendants,' being criminal number 10,495 in said court, she engaged and participated in a wilful oral attack upon the administration of justice in and by the said United States District Court for the District of Hawaii and by direct statement and implication impugned the integrity of the judge presiding therein and in the said pending case, within the territorial boundaries of the Territory of Hawaii, and thus tended to also create disrespect for the courts of justice and judicial officers generally, contra to the obligations and duties assumed, as incident to the license, by her and by every person to whom a license has or shall have been issued by this court to practice in the courts of the Territory of Hawaii. She has thus committed what this court considers gross misconduct."

ment. This is no ordinary case. It is the case of one who has a record of defending persons accused of crime, of representing unpopular labor unions, and of even going to far as to appear for Smith Act defendants. I cannot overlook as a judge what I know as an ordinary citizen in common with every one else, that many persons think that one who would handle such cases as has the appellant ought to be disbarred just on general principles. And when the Supreme Court of Hawaii arrives at a conclusion couched in the language just quoted, which finds no counterpart in any word or statement in the record, I consider it my duty to inquire with care whether such statement really represents the facts of the case.

That we are not limited in our examination of the facts is plain since the Supreme Court heard no testimony but heard the case solely upon the written record and "made its own evaluation thereof" "unprejudiced by the report of the legal ethics committee." Our duty, as a federal court, to find the facts for ourselves in the process of determining whether appellant's claim of a federal right under the Constitution, has been frustrated by erroneous conclusions of the Territorial Court, is recognized by the Supreme Court of the United States. That Court, when reviewing a state court decision under circumstances similar to those here, insists on finding the facts on which the constitutional right turns, for itself. As stated in Stein v. People of State of New York, 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522: "Of course, this Court cannot allow itself to be completely bound by the state court determination of any issue essential to decision of a claim of federal right, else

federal law could be frustrated by distorted fact finding." [2]

Our power to review decisions of the Supreme Court of Hawaii is substantially the same as that exercised by the Supreme Court of the United States in reviewing final decisions of the highest courts of the states.[3] At least ever since Kansas City Southern Ry. Co. v. C. H. Albers Commission Co., 223 U.S. 573, 32 S.Ct. 316, 56 L.Ed. 556, that Court has stated the rule as follows: "In cases brought to this court from state courts for review, on the ground that a federal right set up in the state court has been wrongly denied, and in which the state court has put its decision on a finding that the asserted federal right has no basis in point of fact, or has been waived or lost, this court, as an incident of its power to determine whether a federal right has been wrongly denied, may go behind the finding to see whether it is without substantial support. If the rule were otherwise, it almost always would be within the power of a state court practically to prevent a review here. (cases cited) Another class of cases in which this court will review the finding of the court as to the facts is when the conclusion of law and findings of fact are so intermingled as to make it necessary, in order to pass upon the question to analyze the facts." Truax v. Corrigan, 257 U.S. 312, 324–325, 42 S.Ct. 124, 126, 66 L.Ed. 254. This rule has been announced on numerous subsequent occasions.[4] It is an everyday practice in the review, by the Supreme Court, of state court decisions. Thus in Schware v. Board of Bar Examiners, 353 U.S. 232, at page 239, 77 S.Ct. 752, at page 756, 1 L.Ed. 2d 796, where Schware claimed he had been denied a constitutional right,

2. "But the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which the Congress, by the Act of 1867, provided it should not have." Brown v. Allen, 344 U.S. 443, 500, 73 S.Ct. 397, 443, 97 L.Ed. 469.

3. Cf. Prensa Insular de Puerto Rico v. People of Puerto Rico, 1 Cir., 189 F.2d

1019, 1021, which examines the history of the same jurisdictional Act.

4. Such, for example, as Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 85 L. Ed. 836; and Fiske v. State of Kansas, 274 U.S. 380, 385, 47 S.Ct. 655, 71 L.Ed. 1108.

the Court examined the facts for itself, and at great length, and posed the matter for its decision as follows: "Therefore the question is whether the Supreme Court of New Mexico on the record before us could reasonably find that he had not shown good moral character." It concluded (353 U.S. at page 246, 77 S.Ct. at page 760): "There is no evidence in the record which rationally justifies a finding that Schware was morally unfit to practice law." Hence, it was held, the state had deprived him of due process of law.[5] Other cases in which the Supreme Court, in considering claims of infringement of constitutional rights, found the facts for itself are Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; Konigsberg v. State Bar, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810; and Moore v. State of Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167.[6]

When the facts of this case are thus examined, it should be readily apparent that they do not justify or warrant the conclusion of the Hawaii court above quoted. To assert, as did that court, that the remarks made by appellant, either as charged in the complaint against her, or as shown by the evidence when taken most strongly against her, was a "wilful oral attack upon the administration of justice in * * * the said United States District Court", and that she "by direct statement and implication impugned the integrity of the judge presid-

ing therein", is, it seems to me, to use the language of Mr. Justice Frankfurter in the Schware case, supra, so dogmatic an inference as to be wholly unwarranted, and so arbitrary as to be offensive to due process. Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216; Slochower v. Board of Higher Education, 350 U.S. 551, 559, 76 S.Ct. 637, 100 L.Ed. 692.

I shall discuss, infra, the question whether, even if appellant had made an attack upon Judge Wiig, she exceeded the bounds of an attorney's certain right to criticize a court or judge. But that question is a hypothetical one, for, as I shall show, appellant did not attack the court or the judge. I shall first proceed to show what the record states she did say; and when the facts of the case are viewed as they really are, it becomes manifest that the order of suspension is not only arbitrary and a denial of due process, but an unjustifiable infringement upon appellant's right of free speech under the First Amendment.

The most complete and most nearly contemporaneous account of just what appellant did say at the Honokaa meeting is found in the notes made by a newspaper reporter who attended the meeting and the following day wrote a newspaper account of it. A week later he was asked by his editor to transcribe his original handwritten notes and he did so filling them out and making them understandable to the reader.[7] While appellant denies making some of the statements

---

5. The concurring opinion, rejecting the state court's finding that petitioner was "a person of questionable character", called it "so dogmatic an inference as to be wholly unwarranted." 353 U.S. at page 251, 77 S.Ct. at page 762.

6. Cf. also, Lambert v. People of State of California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228, where it was held conviction under an ordinance was a violation of due process in view of the fact, which the Supreme Court found, that petitioner had no knowledge of the requirements of the ordinance. Another recent case which shows the same approach where there was a claimed de-

nial of the right of free speech, is Staub v. City of Baxley, 355 U.S. 313, 318, 78 S.Ct. 277, 280, 2 L.Ed.2d 302. The question was the sufficiency of the pleadings to present the point in the state court. It was asserted this was a question of local procedural law. The court held: "Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or a law of the United States, is necessarily a question of federal law and * * * the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice."

7. The original handwritten notes, taken at the meeting, had been given to the FBI

**216**

found in the notes, for the purposes of this opinion I take the version shown by the notes. The majority opinion, for the purpose of indicating what happened at the meeting, quotes the newspaper account on the ground that the Hawaii court accepted that as accurate. The reporter, at the hearing, some two years after the speech was made, did not testify that the newspaper story was an accurate statement of what transpired. He merely stated that he wrote the story "based upon the notes * * * made during the speech." My objection to its use is not because it is mere hearsay, but it could furnish an excuse for not examining the facts. No one can claim to know what this case is about unless he has read, with care, the full notes of the speech made by the newspaper reporter. They appear as Exhibit B attached to Judge Chambers' opinion.

The newspaper account gives no support to the Hawaii court's conclusions. But in arriving at the facts here it should be noted that the story is distorted, for the reporter has selected, as no doubt most reporters would do, only the most startling portions of the speech, —the parts containing the best headline material.

But when all the notes are read, an unmistakable picture of just what kind of speech was made, and what it was about, clearly emerges. What we have here is an attack on the methods used in all Smith Act prosecutions, including the one then pending, and hence, implicitly an attack on the Smith Act itself. The notes show exactly what appellant talked about. It was as follows: (a) Men in power are trying to put men in jail for what they think and what they read; (b) the prosecutions are for conspiracy— when the Government charges conspiracy, it has no case—"conspiracy means to charge a lot of people for agreeing to do something you have never done"; (c)

The FBI's special agents, widely publicized as wonderful, spend their time investigating people's minds, while hundreds of tax frauds go unprosecuted; (d) Among the agents so used were Paul Crouch and Johnson;[8] Crouch testified what he was told by generals when he was "galloping over the plains of Russia" at a time when one of the defendants was four years old, while Johnson testified he carried some Communist books from San Francisco to Honolulu, in a duffle bag, and showed the bag to Jack Hall; (e) On the strength of this the Government "for two days reads from books supposed to have been in the duffle bag * * * so jack hall violated the smith act because he saw a duffle bag with some books on overthrowing the government in it. its silly;" (f) Crouch testified to things he couldn't possibly remember. Yet they use this kind of testimony. (g) "Some of the witnesses testified differently from what they testified previously." (h) "witnesses testify what government tells them to"; (i) "they will do anything and everything necessary to convict"; (j) "the government has carried on a barrage of propaganda" and "expects people in the jury to have hysteria just hearing about communism is enough to jail"; (k) an account of a Sears Roebuck employee who knew Hall. When he refused to testify against Hall the FBI asked his employer to fire him,— when he was not fired they went to the Los Angeles and Chicago officers of the employer and convinced them he had to be fired; (l) "the government gets away with it by making people fear that if they don't do as it wants they'll be branded red and lose their jobs, there's no such thing as a fair trial in a smith act case. all rules of evidence have to be scrapped or the government can't make a case"; (m) in the Palakiko-Majors case[9] the court would not let a woman testify she heard a police officer say he beat the prisoner,

by the reporter. They were not produced and the record shows no serious effort by the Bar Committee to obtain them.

8. The Fujimoto record indicates this was not Manning Johnson but a Henry Johnson.

9. See Palakiko v. Harper, 9 Cir. 209 F.2d 75.

because the officer was absent and had no chance to deny it, yet the judge permitted Crouch "to testify about 27 years ago. what was said then", at a time "when the defendant was 5 years old." (n) "there's no fair trial in the case. they just make up the rules as they go along"; (o) A reference to the New York Smith Act case: "the government can't make a case if it tells just what they did so they widened the rules and tell * * everything including the kitchen sink"; (p) "unless we stop the smith trial in its tracks here there will be a new crime. people will be charged with knowing what is included in books. ideas." (q) "mentioned los angeles trial in which someone said there was no evidence that someone had instructed persons not to read some books"; (r) "there'll come a time when the only thing to do is to keep your children from learning how to read. then not only will unions be destroyed but so will freedom of thoughts and action, there'll be dark ages of thought control when people won't be able to speak freely in taverns and other places"; (s) "urged audience to * * * explain what a vicious thing the smith act is. people are tried for books written years ago."

The most interesting thing about this near-contemporaneous record of the speech is that it is devoid of any attack upon Judge Wiig or his court. The only reference to the judge was the criticism of his ruling (item "m" above) on the admission of the Crouch testimony. But this was no attack on his integrity. Aside from this the judge was not even referred to. His name was not mentioned. These notes of the reporter are of special importance here, not merely because they were made when his memory was fresh, but also because, as I shall shortly show, they were confirmed by the other witnesses who testified. In short, the notes are a fair summary of all the evidence.

This record does not warrant a conclusion that the integrity of Judge Wiig was attacked. Everything in it is consistent with appellant's position that the speech was directed at Smith Act prosecutions and the Smith Act, and not at Judge Wiig personally. Some of the remarks quoted in the notes she denied making, but I assume for the purposes of this opinion she made all of them, just as the notes show.

Take the statement about "some rather shocking and horrible things that go on at the trial." Have a look at the notes. This remark is made at the beginning, obviously by way of introduction of what she proposed to tell as she went along. The meaning is plain: I am about to tell you some rather shocking and horrible things that go on. What these "horrible and shocking things" were she specified in detail, extending the itemization to Smith Act trials generally. These were: the use of conspiracy counts; the use of such witnesses as Crouch and Johnson; the use of such "silly" testimony as that given by them; the Government's knowing use of witnesses whose testimony was contrary to that previously given; the Government's propaganda intended to give juries hysteria. Nowhere is there any "shocking and horrible" thing charged to the judge—the specific acts recounted are charged to the Government; to its means of prosecution, and to the Smith Act itself. No witness testified that in this connection, or at any place in the speech, was there any mention made of Judge Wiig.

The Hawaii court wholly failed to consider the context in which the "shocking and horrible" words were used. Its opinion lumps these words with other supposed quotations from the speech, wholly without any attempt to analyze the phrase as the opening of a 30 minute speech. As quoted by the court, appellant said "that a fair trial was impossible." On such truncated quotation it is sought to show that this was a remark limited to the Fujimoto case alone, rather than addressed to Smith Act trials generally, as appellant testified. The notes, read in their entirety, as well as the other testimony, fully disclose that she was discussing all Smith Act cases.

The notes show she said: "There's no such thing as a fair trial in a Smith Act

case." After contrasting the exclusion of hearsay in the Palakiko case with the use of Crouch's testimony about what happened 27 years ago, she continued "There's no fair trial in the case. They just make up the rules as they go along." That by this she was still referring to all Smith Act cases is apparent, for she proceeded immediately to illustrate this by describing how this was done in the New York Smith Act case in 1949, with her reference to "everything including the kitchen sink." These were not different speeches—all occurred in the same 30 minutes. No part may fairly be read out of context.

John D. Morse, a witness called by the prosecutors, who was Industrial Relations Director of Honokaa Sugar Company, testified as follows: "Q. Mr. Morse, do you remember Mrs. Bouslog making any statement as to whether there was such a thing or not as a fair trial in the Smith Act case? A. I remember her saying there was not such a thing as a fair trial in a Smith Act case. Q. And do you remember whether she referred to the conduct and manner in which it was being handled? A. Well, it tied in, I figured it, tied in with any Smith Act case, whether in Honolulu, New York, or whatever it was; that is the impression I got from what she said."

The next mistake in the Hawaii court's statement is its recital that she said "that all of the rules of evidence *were being scrapped* so the government could make *its case*." (Emphasis mine.) So worded it seems to refer exclusively to what was *presently* going on in Honolulu. But the notes have her saying, immediately following a reference to any Smith Act case: "All rules of evidence *have to be scrapped* or the government can't make *a case*." (Emphasis mine.)

This remark, too, when read in context, clearly was not directed against the judge. As the notes show, it was immediately followed by her illustration of the distinction between other trials and conspiracy trials by reference to the Palakiko habeas corpus case where hearsay

was excluded contrasted with the present conspiracy trial where "they permit a witness to tell what was said when a defendant was five years old." This is the same idea she expressed in her reference to the New York trial. A large part of the talk was devoted to her claim of the excessive breadth of conspiracy trial evidence. As appellant explained to Judge Wiig, this remark about rules of evidence having to be scrapped, referred to the use of declarations of third persons in conspiracy cases. There is no proof whatever that it was used otherwise. And the prosecution witness Ferreira testified: "Q. Just tell the Committee to the best of your recollection what Mrs. Bouslog said. A. She started off telling us about the Smith Act trial; that there was no fair trial in the Smith Act case; that the government—I mean, they made up their rules as they went along in Smith Act trial, and she compared the Majors-Palakiko case with the Smith Act trial, and she also stated that in the Smith Act trial they tried you on a conspiracy, and 'conspiracy' was explained to us, not the exact wording, but was something that they tried you for, for your thoughts; in other words, something that some people think, or you might think of, or this person might think of doing some day, but never actually did, but that is how she explained it on this conspiracy."

The final statement listed in the Hawaii court's opinion is that referring to "stopping the Smith trial in its tracks." Taking it as it appears in the notes, and disregarding a slight inaccuracy in the court's version, she said: "Unless we stop the Smith trial in its tracks here there will be a new crime. People will be charged with knowing what is included in books. Ideas." Just what this statement, so recorded by the reporter, meant, is not explained by any proof offered by the prosecutor. The one thing clear about it is that it could have no reference to Judge Wiig. On the face of these exact words I would think stopping the Smith trial in its tracks would mean getting a verdict of acquittal. Or it

might mean what actually happened to the case. See Fujimoto v. United States, 9 Cir., 1958, 251 F.2d 342. Appellant herself gave an explanation. Denying these were the exact words, she said: "I did state in substance something that is reminiscent of that. I said that the Smith Act—continued prosecutions under the Smith Act can lead to a new crime of reading and thought control, and I quoted, as I told Judge Wiig—I quoted the exact language of the prosecutor in the Smith Act trial in Los Angeles, where he had said that all the defendants did was ask people to read, read, read, and they never told people not to read anything. And I said that I felt that the Smith Act would be repealed as soon as people understood what the Smith Act was."

No other witness testified as to this statement. But the reporter's notes tend to confirm her explanation for they show the remark was followed by the reference to reading made in the Los Angeles trial. The confirmatory value of those notes is particularly striking since just two days after the speech, and nearly a week before the notes were typed, and when appellant could not have known what was in them, she gave precisely the same explanation to Judge Wiig. Whether her explanation that she was advocating repeal of the Smith Act be accepted or not, there is no proof whatever that it had any more serious import.

As a final step in analyzing the evidence I allude to a statement which is not listed in the complaint or the opinion, but which appellee seems to think tends to show appellant was directing her talk against Judge Wiig. This is the statement "They just make up the rules as they go along." The use of the pronoun "they" is clear enough. It is in the reporter's notes. All the witnesses who referred to this statement said "they", or "the Government" in connection with the phrase. That this "they" referred to the Government is clear from the whole context. Previous to this phrase, the notes show appellant was throughout talking of the Government. The *Government* "when it hasn't got enough evidence it lumps a number together"; "the *government* does not say advocated overthrow but says they agreed to"; "the *government* goes on with testimony for two weeks on what crouch did"; "the *prosecution* says crouch did this and that"; *Government* propaganda has been going on "the *government* says there was an agreement to violate smith act"; as to witnesses telling conflicting stories, "the *government* knows this but deliberately goes ahead"; "witnesses testify what *government* tells them to"; "then the *government* for two days reads from book"; "the *government* has carried on a barrage of propaganda"; "the *government* gets away with it by making people fear". When all this is followed by "They just make up the rules as they go along", it is absurd to say that appellant was now including the judge in the "they". Appellee argues that as a matter of course it is the judge who makes the rules. The trouble with this is that the evidence does not show she made any such statement. And its improbability appears from the fact that when the speech was made Judge Wiig was still reserving ruling on much of the evidence. All significant rulings were made by Judge Wiig late in the case and long after the speech.[9a]

A proceeding of this kind cannot be founded upon such dubious evidence;— a judgment of disbarment or suspension [10] cannot be supported by that kind of proof. The power to order disbarment "is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of mis-

---

9a. This I develop later. See text opposite footnote 19 infra.

10. Appellant claims that in her case suspension means the same as disbarment, since Rule 15(d) of the Territorial Supreme Court, adopted October 3, 1955, requires a lawyer once suspended to start all over, proving his worthy character, and passing a new bar examination. Apart from that I see no difference, for the purposes of this case, between a disbarment and a suspension.

conduct, which affect the standing and character of the party as an attorney." Ex parte Wall, 107 U.S. 265, 288, 2 S.Ct. 569, 589, 27 L.Ed. 552. See accord, In re Spicer, 6 Cir., 126 F.2d 288, 289. "It is settled that charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty and that any reasonable doubts should be resolved in favor of the accused." Brawner v. State Bar of California, 48 Cal.2d 814, 313 P.2d 1, 3. This requirement of clear proof is insisted upon by the courts generally.[11]

In my view there can be no other conclusion here than that the appellant's speech was an attack upon the Government's method of procedure in Smith Act cases including the one then on trial at Honolulu; and an attack upon the Smith Act generally.[12]

Upon these facts it is impossible to avoid the conclusion that what appellant had to say did not overstep the limits of that freedom of speech guaranteed by the First Amendment. As I shall hereafter demonstrate, her right to discuss and criticize the mode of prosecution of Smith Act cases extended not only to cases previously tried, but to the pending case as well. That the Honolulu case was still pending made no difference whatever, as Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, and the cases which followed it, discussed hereafter, abundantly show.

Why appellant chose to make such a speech to that audience and at such a time and place is difficult to comprehend. It seems probable that few, if any, of her audience had any understanding of what she was saying, and it cannot be believed that she thought any one present could do anything about repealing the Smith Act. I assume that the Union, under whose auspices the meeting was held, was being urged to help in the defense. Its Regional Director, Hall, was one of the defendants. A report to the union on the progress of the trial, which had just begun, would of course be in order; and a simple appeal for funds should serve to secure financial aid, if that were her purpose. But this particular speech, which, in view of the temper of the times was bound to cause her trouble, must have been undertaken, I think, primarily as a means of expressing a bitter resentment at what she thought were monstrous injustices.

But whether I can find reason for that speech, and my own disagreement with it are wholly irrelevant. In the words of Judge Pound: "Although the defendant may be the worst of men * * * the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected."[13] That speech is unreasonable, exaggerated, and offensive, does not deny it freedom. Speaking for the Court in Cantwell v. State of Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, where the words of the defendant were especially outrageous, Mr. Justice Roberts said: "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and

---

11. The cases are collected in 7 C.J.S. Attorney and Client § 33, pp. 784–785.

12. So far as her attack on the Smith Act is concerned, it is of interest that she could not have foreseen that if she would but hold her fire, she might have saved herself some trouble. Her timing was poor. The decision in the Yates case (Yates v. United States), 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356, if we take the words of Judge Chambers for it, left that Act "a virtual shambles".

Fujimoto v. United States, 9 Cir., 1958, 251 F.2d 342. At any rate, her clients went free. (Of course the majority of the court who sat with Judge Chambers did not concur in his statement that the Act was a shambles. Nor would I. All Yates did was to show that the Act punished only incitement to action, and not mere advocacy of doctrine.)

13. People v. Gitlow, 234 N.Y. 132, 158, 136 N.E. 317, 327.

even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." [14]

Freedom of speech is not absolute. It may be limited where the facts show a "clear and present danger." [15] But most assuredly freedom of speech does not mean freedom of speech that is true, or sound, or reasonable. It means freedom of speech, period. Freedom means nothing unless it includes freedom for those we hate. [16] Freedom of speech is only a delusion unless it means freedom for others to express what we detest. Though a speech "stirred people to anger, invited public dispute, or brought about a condition of unrest," punishment for making it violates the First Amendment. Terminiello v. City of Chicago, 337 U.S. 1, 5, 69 S.Ct. 894, 896, 93 L.Ed. 1131. "For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Bridges v. State of California, supra, 314 U.S. at page 263, 62 S.Ct. at page 194. In its broad scope it draws no line, it does not exclude lawyers, or even lawyers who represent the ILWU or persons claimed to be Communists.

In thus making an attack upon the Department of Justice,— "the Government" —for the manner in which it was prosecuting Smith Act cases, appellant listed many items of grievance. She criticized the use of the conspiracy technique; [17] she criticized the use of "agents of FBI" generally, and of Crouch and Johnson in particular; she criticized the use of the Government's "barrage of propaganda", and charged the FBI with pressuring Sears Roebuck to "fire" a man because he would not testify against one of the defendants. She charged that the prosecution would "do anything and everything necessary to convict"; that "witnesses testify what the Government tells them to". She urged her audience to tell "what a vicious thing" the Smith Act is.

14. In Near v. State of Minnesota, 283 U.S. 697, at page 718, 51 S.Ct. 625, at page 632, 75 L.Ed. 1357, Chief Justice Hughes made the same point by quoting from Madison. "Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigor of those yielding the proper fruits. And can the wisdom of this policy be doubted by any who reflect that to the press alone, chequered as it is with abuses, the world is indebted for all the triumphs which have been gained by reason and humanity over error and oppression; who reflect that to the same beneficent source the United States owe much of the lights which conducted them to the ranks of a free and independent nation, and which have improved their political system into a shape so auspicious to their happiness? Had 'Sedition Acts' forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press, might not the United States have been languishing at this day under the infirmities of a sickly Confederation? Might they not, possibly, be miserable colonies, groaning under a foreign yoke?"

15. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470.

16. Cf. Girouard v. United States, 328 U.S. 61, 68, 66 S.Ct. 826, 829, 90 L.Ed. 1084, quoting Mr. Justice Holmes in the Schwimmer case (United States v. Schwimmer, 279 U.S. 644, at pages 654-655, 49 S.Ct. 448, at page 451, 73 L.Ed. 889): "If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate."

17. A classic discussion of that subject is that of Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790.

"People are tried for books written years ago."

As I read the newspaper reporter's notes of the speech it seems to me that the prime subject of her speech was Crouch, and other Government witnesses. She alluded to her Honolulu Labor Day speech in which she had discussed professional witnesses, former Communists now paid by the Government. She did not otherwise identify Crouch.[18] The fact that appellant's principal complaints related to the use of Crouch and to his testimony, and similar testimony of other witnesses, sharpens up the point that there was no attack on Judge Wiig. The record in the Fujimoto case is here and is available to us. Latta v. Western Inv. Co., 9 Cir., 173 F.2d 99, 103; United States v. Pink, 315 U.S. 203, 216. Judge Wiig did not rule upon Crouch's testimony until long after the speech, indeed, nearly three months later. Then, on March 10, the court ruled on motions to strike this and other testimony which had been received subject to motion to strike. (Some of Crouch's testimony was then stricken along with that of some others.)[19]

One cannot fairly find in this speech any attack upon the integrity of the judge. Proof of any such thing is completely wanting. There is not a scintilla of evidence to that effect,—far less the "clear and convincing evidence" which such a case requires.

When it is recognized that there was no attack on the integrity of the judge, the whole case collapses. Stripped down to its actual facts the judgment of the Hawaii court means no more and no less than that for such an attack on the Department of Justice, an attorney may be disciplined by suspension from practice. True, the court below never got down to stating the proposition in those simple terms. Its faulty findings were masked with generalities like "attack upon the administration of justice", and "disrespect for the courts." Surely no one argues that a lawyer may be disbarred for an attack upon the Department of Justice.

The freedom of speech of the First Amendment is a peculiarly American concept. Historians have shown,[20] and the Supreme Court has held that this amendment was not, like some other provisions of the Bill of Rights, a mere adoption of rules deeply rooted in English common law at the time of the Constitution. "No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." Bridges v. State of California, supra, 314 U.S. at page 265, 62 S.Ct. at page 194.[21]

And this amendment is not only first in number but first in importance of

---

18. He was the Paul Crouch, who with Manning Johnson and Matusow, were described in Communist Party v. Subversive Activities Control Board, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003, as "three perjurious witnesses."

19. The record there shows that the Government's case was built largely around Crouch and his testimony. He was the lead-off witness. He was on the stand from November 12 through November 24, and his testimony covers 962 pages. As the Government briefs in that case show, the case was based upon the theory of Marxism-Leninism. The briefs emphasize the importance attached to proof of that theory by the prosecution. Crouch was the witness on whom they depended for this proof. He testified as an expert on the Communist Revolu-

tion and the theory of the Communist Conspiracy, the Comintern, the Red Army, and Red Army materials. According to the witness he himself was on an executive committee of the Communist International to draw up a plan for infiltration of the armies of the capitalist countries. The witness testified he arrived in the Soviet Union in 1927. He was asked: "Q. And while you were in Russia, what did you do and did you meet any person?" When this was objected to, upon Government counsel's statement that he would later "tie the testimony in" the witness was allowed to proceed subject to motions to strike.

20. Zechariah Chaffee, Jr., "Free Speech in the United States", Chap. 1.

21. The Court quoted (314 U.S. at page 264, 62 S.Ct. at page 194) Madison's

those ten amendments. Cut off freedom of speech, or of the press, and you stop the very lifeblood of a democracy which may live and function only if knowledge and opportunity for discussion are available to all. As Madison said: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: and a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." [22] In United States v. C.I.O., 335 U.S. 106, 129, 144, 68 S.Ct. 1349, 1368, 92 L.Ed. 1849, Mr. Justice Rutledge, speaking for himself and three other justices concurring, said: "The most complete exercise of those [First Amendment] rights is essential to the full, fair and untrammeled operation of the electoral process. To the extent they are curtailed the electorate is deprived of information, knowledge and opinion vital to its function."

Another reason why attacks on the freedom of an individual to speak must be struck down is the way in which the consequence of a single failure to respect that right may spread, like a mantle of fear, over the whole nation. Suspending one person like Harriet Bouslog Sawyer from the practice for one year is not merely the imposition of punishment on her. In upholding this judgment this court serves notice on all lawyers everywhere to hold their tongues, to watch their speech, lest some court hold criticism of a state or federal prosecutor's procedures be ground for disbarment. The very thought that such a proceeding as this might be started would be enough to dry up criticism of government prosecutions no matter what abuses may exist. That is why this freedom is of the very essence of liberty. Let the courts tolerate one single instance of punishment for exercising freedom of speech, and all who heard of it, if they be men of

caution, will instantly cease to be free. "When you put the hotheads in jail, these cooler people do not get arrested—they just keep quiet. And so we lose things they could tell us, which would be very advantageous for the future course of the nation. Once the prosecutions begin, then the hush-hush begins too. Discussion becomes one-sided and artificial. Questions that need to be threshed out do not get threshed out." Chaffee, supra, loc. cit. 561.

Infringement of freedom of speech destroys thought itself. Instead of inquiring:—"Are these the facts?" "Do I believe this?" we would be asking: "If I think this way, and say so, will I be considered 'controversial', or 'disloyal', or 'subversive'? Will it cause me trouble?" In his recent Reith Lectures at Oxford University George Kennan noted the Russians' "systematic abuse of the human intellect"; "the fact is that the Soviet leaders are the first and leading victims of the abuses they have practiced so long on the freedom of the mind."

The contention here is that appellant cannot claim to be in the position of an ordinary critic of the Department of Justice, for in attacking what went on in Judge Wiig's court she necessarily included the judge for he must have permitted it. Evidence criticized, it is said, was necessarily that which the judge admitted. Furthermore, goes the argument, appellant was violently attacking proceedings in a case in which she was counsel. She was trying her case in a public meeting, with a view to influencing the outcome, and this, it is said, is a violation of a lawyer's professional obligation. This position, I think, will not bear analysis.

In the first place, if we examine what appellant was really saying, it is clear that there was no charging of Judge Wiig with these things. To say she must have been blaming Judge Wiig for Crouch being a witness, or for his testi-

---

statement that "The state of the press * * * under the common law, cannot

* * * be the standard of its freedom in the United States."

**22.** Letter to W. T. Barry, August 4, 1822.

mony is not correct. Of course no one could think the judge selects the witnesses, or thinks up what they shall be asked. The use of the conspiracy form of indictment was, as anyone would know, something chargeable only to the prosecution. I have previously noted, supra, (text opposite note 19), that the important rulings on the admission of testimony came long after the date of this speech;—they certainly were not included in the condemnations of the talk.

But even if rulings admitting evidence, and other rulings on points of law had been the subject of appellant's attack, nothing is more plain, I think, than that courts are properly subject to such criticism, and freedom of speech in that direction is within the First Amendment protection. While Mr. Justice Frankfurter, in his opinion in Bridges v. State of California, 314 U.S. 252, 284, 62 S.Ct. 190, 204, was dissenting, yet it is clear the whole Court would approve his statement: "Of course freedom of speech and of the press are essential to the enlightenment of a free people and in restraining those who wield power. Particularly should this freedom be employed in comment upon the work of courts who are without many influences ordinarily making for humor and humility, twin antidotes to the corrosion of power." And he quoted in a footnote from a speech by Mr. Justice Brewer (314 U.S. at page 289, 62 S.Ct. at page 207): "It is a mistake to suppose that the Supreme Court is either honored or helped by being spoken of as beyond criticism. On the contrary, the life and character of its justices should be the objects of constant watchfulness by all, and its judgment subject to the freest criticism. The time is past in the history of the world when any living man or body of men can be set on a pedestal and decorated with a halo. True, many criticisms may be, like their authors, devoid of good taste, but better all sorts of criticism than no criticism at all. The moving waters are full of life and health; only in the still waters is stagnation and death."

Suppose appellant had said: "They produce these witnesses like Crouch, and he testifies to what somebody said when Aileen Fujimoto was only four years old," and then added: "and Judge Wiig lets them do it." We must remember that the test of judicial or legislative power to restrict freedom of speech is the "clear and present danger" standard. The notion that even a direct reference to Judge Wiig, such as that in the supposititious statement I have just assumed, could be a clear and present danger to the fair administration of justice in Judge Wiig's court is manifestly absurd. Such restrictions on appellant's right to speak as were imposed by this judgment are subject to the condemnatory language of the court in Bridges v. State of California, supra (314 U.S. at page 270, 62 S.Ct. at page 197): "If they can be justified at all, it must be in terms of some serious substantive evil which they are designed to avert. The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect. * * * We must therefore turn to the particular utterances here in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment." Then, after discussing the language used in the statements there involved, the Court concluded (314 U.S. at page 278, 62 S.Ct. at page 201): "The words of Mr. Justice Holmes, spoken in

reference to very different facts, seem entirely applicable here: 'I confess that I cannot find in all this or in the evidence in the case anything that would have affected a mind of reasonable fortitude, and still less can I find there anything that obstructed the administration of justice in any sense that I possibly can give to those words.' "

The same test was applied in Pennekamp v. State of Florida, 328 U.S. 331, 348, 66 S.Ct. 1029, 90 L.Ed. 1295 and Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546. In the latter case, the Court, speaking of the Constitutional limits on the power of a court to punish for contempt, said: "This was strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one 'who ventures to publish anything that tends to make him unpopular or to belittle him. * * *' The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil. * * * But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Conceivably a campaign could be so managed and so aimed at the sensibilities of a particular judge and the matter pending before him as to cross the forbidden line. But the episodes we have here do not fall in that category. Nor can we assume that the trial judge was not a man of fortitude."

The significance of these three cases, (Bridges, Pennekamp, Harney) is that although they dealt with contempt proceedings, the basis of the decision in each case was the constitutional limitation. The same absence of a clear and present

danger which voided these contempt orders would make the Hawaii court's judgment in this case a prohibited restriction on free speech even if the speech had expressly included the judge in the supposititious manner indicated. I take it no one will contend that conduct which could not validly be punished as contempt may nevertheless be disciplined by suspension from practice.

The three cases last mentioned also completely dispose of the suggestion that attack may not be made on proceedings in court in a *pending* case. The Supreme Court dealt with that question at length. Of course, the possibility of clear and present danger to the functioning of a court of justice from certain speech or publication could occur if they were directed to pending proceedings.[23] But the facts of this case present no such situation. That a speech in a town of 1000 population,[24] in the island most distant from Honolulu posed a clear and present danger to the administration of justice in Judge Wiig's court, is inconceivable. There is neither finding nor argument to that effect made here.

As for the circumstance that appellant was counsel in that pending case, this is wholly irrelevant. *If* it were not for Cammer v. United States, 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474, and *if* appellant were being proceeded against in the United States District Court for Hawaii for contempt of that court (she was not, and Cammer says she could not be), then her connection with that case might have meaning. But that it has no significance here even the Hawaii court seems to have recognized, for this circumstance is not even mentioned in its conclusion.[25]

Finally, what of the suggestion that while a newspaper or a layman may criticize prosecuting officers, and attack courts and judicial officers, yet the constitutional free speech protections do not extend to such actions by a lawyer? I do not here refer to utterances of a lawyer

23. The language above quoted from Craig v. Harney, supra, is that "conceivably" in a matter pending, a campaign could "cross the forbidden line."

24. Hammond's World Atlas, 1955 ed., gives Honokaa's population as 1021.

25. This is the conclusion quoted in footnote 1, supra.

which (a) threaten the judge's person or reputation,[26] or (b) charge that the court or judge has knowingly misused its powers in a particular case,[27] or (c), assert that the judge is corrupt or politically motivated.[28] There is no such case here, as I have shown. Actually Judge Wiig was not even criticized, much less attacked.

But in respect to such criticism, as was here made, no suggestion has ever been made that a lawyer's criticism is any less protected than when made by a layman or a newspaper. Indeed, everything that has been said authoritatively about the First Amendment is to the effect that the rights there granted are universal and all-covering. "For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Bridges v. State of California, supra, 314 U.S. at page 263, 62 S.Ct. at page 194.

I think it would be a sad day when a court held that a lawyer has any less right to criticize the Smith Act, or the use of conspiracy indictments, or of professional witnesses, or the results and decisions in the Yates and Dennis cases, than any other person. For the lawyer is, above all other persons, the one best equipped by training to discuss such controversial questions. To say they may be discussed by laymen, but not by lawyers is untenable.

Rather than saying that the right of a lawyer to criticize or attack current judicial procedures is less than that of a layman, there is reason for belief that the lawyer's speaking out on such matters serves a public purpose. Court proceedings, especially criminal proceedings, have an impact on fundamental rights. It is essential that the people be informed on such rights. Lawyers are equipped to discuss them. They know, what Judge Learned Hand has said: "Liberty lies in the hearts of men and women; when it dies there, no constitution, no law, no court can save it." [29] Professor Thomas Reed Powell has been quoted as saying, "Nine men in Washington cannot hold a nation to ideals which it is determined to betray."[30] I see no way in which it can be held that a President of a Bar Association may discuss these things but persons holding appellant's views may not.

This case bears a striking resemblance to the threatened disbarment in 1938 of one Edward Lamb, a Cleveland lawyer, said to have been a "labor lawyer". While the case never came to trial and was not reported, the part taken in it by the then Solicitor General Robert H. Jackson can be found reflected in a later decision of the Supreme Court to which I shall hereafter allude—a decision of importance here. Lamb, during the trial of a case, and in the courtroom, said directly to the judge: "We were hijacked through this court all day yesterday, and I will tell you now I don't intend to be hijacked all day today." The judge might have punished him for contempt, but did not do so. However, proceedings were brought to disbar him. The Solicitor General came to Lamb's aid, as he concluded from the record Lamb did not deserve disbarment. Jackson was criticized for going on Lamb's committee. He wrote a letter in reply to that criticism. When the letter was made public the disbarment was dropped. The letter precisely fits the situation here. Mr. Jackson noted that the court had an ade-

---

26. Bradley v. Fisher, 13 Wall. 335, 20 L. Ed. 646.

27. Duke v. Committee on Grievances, 65 App.D.C. 284, 82 F.2d 890.

28. Cobb v. United States, 9 Cir., 172 F. 641.

29. Hand, "The Spirit of Liberty."
 "In this connection we must remember that the strength of the Constitution

is not in the written instrument, nor in the laws enacted to carry it into effect, nor even in the judiciary which interprets and enforces the laws, but in the minds and hearts of the people." Judge John J. Parker, American Bar Association Journal, Jan. 1958.

30. See Chaffee, Free Speech in the United States, Chap. X.

quate remedy for any contempt. "For some reason this remedy was abandoned." Then followed the declaration of a rule which the author, as an Associate Justice, later wrote into an opinion: "Mere contempt of court has never been considered cause for disbarment." Mr. Jackson proceeded: "Hot words, even to a judge, do not usually deprive one of his livelihood. If you are familiar with the history of the Bar, many instances of contempt without disbarment will occur to you. Elihu Root and Willard Bartlett were, with other bar leaders, adjudged to be in contempt of court when they were defending William M. Tweed. No one suggested that either of them should be disbarred. Instead, one became a great leader of the American Bar, and the other became Chief Judge of the New York Court of Appeals.[31] * * * In Lamb's case, however, the Court allowed the time for appropriate remedies for Lamb's contempt to pass, and the Bar Association then proposed disbarment, which would drive Lamb from his profession for life and deprive him of a livelihood. I know of no adequate explanation of this fierce and vindicative proposal except that Lamb is a labor lawyer."

\* \* \* \* \* \*

"You suggest that the defense of Lamb proceeds from a desire to break down the judicial system. This, it seems to me, shows a lack of understanding of the requirements of a judicial system. We can have no worthy judicial system unless we protect the right of advocates to champion the cause of any person who becomes involved in the machinery of the law.

\* \* \* \* \* \*

"I do not expect a breach of conduct which would be passed, generally, with a small fine or an apology to be made the excuse for depriving a labor lawyer of his right to practice his profession, or to deprive labor of a representative who has zeal in its cause, even if the zeal is sometimes misdirected." The full text of the letter is in the margin.[32]

31. These matters were described somewhat more in detail in Mr. Justice Jackson's opinion for four of the members of the Court in In re Isserman, 345 U.S. 286, 290, 293, 73 S.Ct. 676, 97 L.Ed. 1013. The four judges were the majority who set aside the disbarment order at 348 U.S. 1, 75 S.Ct. 6, 99 L.Ed. 3.

32. "June 7, 1938
"Mr. William R. Daley
Cuyahoga Building
Cleveland, Ohio
"Dear Sir:
"I have your letter criticizing me for authorizing the use of my name in connection with the protest against the disbarment proceedings involving Edward Lamb. I usually ignore criticism, on the theory that friends require no explanation, enemies will accept none, and others do not care. Since your criticism has been so painstaking as to lead you to read the record in the case, I shall depart from my usual rule.

"The language of Lamb to the effect that he had been hijacked and did not intend to be hijacked again is not approved or defended by the committee of which I am a member, as you would see if you had read its statement. Neither do we assume to sit in judgment on the conduct or rulings of the court.

"The court had an adequate remedy for any contempt. If I were presiding and was not conscious of having provoked such language, I should hold a counsellor in contempt and fine him appropriately and commit him until it was paid. This would be proportioned to the offense, would be an adequate humiliation to any lawyer, and would vindicate the dignity of the court. For some reason this remedy was abandoned. Timely and fairly used, it would have been no affair of lawyers generally, even if the penalty might seem to them excessive or the offense excusable.

"Mere contempt of court has never been considered cause for disbarment. Hot words, even to a judge, do not usually deprive one of his livelihood. If you are familiar with the history of the Bar, many instances of contempt without disbarment will occur to you. Elihu Root and Willard Bartlett were, with other bar leaders, adjudged to be in contempt of court when they were defending William M. Tweed. No one suggested that either of them should be disbarred. Instead, one became a great leader of the American Bar, and the other became Chief Judge of the New York Court of Appeals. Recently in the District of Columbia a lawyer was found guilty of contempt and punished, and immediately

In this letter Mr. Jackson suggested that the reason for that proceeding was that Lamb was a labor lawyer. Appellant here was a labor lawyer.[33] She was also a lawyer for alleged Communists. In alluding to that I do so only for the purpose of suggesting that this circumstance is the reason I feel we should examine the facts with the greatest of caution lest our detestation of Communism obscure our vision. I make no suggestion here similar to the strictures of Mr. Jackson. I feel sure that this proceeding was instituted in good faith.

But there is one advantage we today have over the prosecutors as they stood in December, 1952. For since that time all of us have learned much about Communism, and that it is a more deadly peril than we had thought. . Now we are learning that the way to fight Communism is not by aping its denial of liberty, or its suppression of freedom of speech. When this proceeding was started a generally held notion of our national peril was epitomized in the cry, "Who promoted Major Peress?" When we thought of Communist we thought only of the neigh-

thereafter was elected to high office in the American Bar Association. Not long ago a leader of the New York Bar was adjudged in a Federal Court to have been 'studiously contemptuous' even characterizing parts of the court's charge as a 'stump speech.' He paid his fine and no one suggested that disbarment be inflicted or even considered. A government lawyer was fined for contempt in the same case—nor was he deprived of office or of standing at the Bar. Many other instances could be cited.

"In Lamb's case, however, the Court allowed the time for appropriate remedies for Lamb's contempt to pass, and the Bar Association then proposed disbarment, which would drive Lamb from his profession for life and deprive him of a livelihood. I know of no adequate explanation of this fierce and vindicative proposal except that Lamb is a labor lawyer. That offensive and habitual activity on behalf of labor is the cause of his prosecution is affirmed by examination of the petition for disbarment with its allusion to 'class hatreds,' and is further confirmed by the reference in your letter to 'corporation baiters.'

"This raises an issue wider than the relative proprieties of the lawyer and the judge. I take it that you will grant that in the economic struggle labor is entitled to have its lawyers. If from habitual representation of labor causes they become known as 'corporation baiters,' I know of no reason why they, any more than their counterparts who become exclusively 'corporation lawyers' should be disbarred. I do not think of any specialty in law practice, but I grant the right, and will defend the right, of a lawyer to devote himself to labor representation as his specialty, if he desires.

"You suggest that the defense of Lamb proceeds from a desire to break down the judicial system. This, it seems to me,

shows a lack of understanding of the requirements of a judicial system. We can have no worthy judicial system unless we protect the right of advocates to champion the cause of any person who becomes involved in the machinery of the law. I know of no group today that needs competent lawyers to defend it in the courts more than labor. May I remind you that of eleven Labor Relations Board cases on which the Supreme Court has passed, seven of them—more than two-thirds of them—the Supreme Court held to have been unlawfuly and improperly decided against labor by the lower court judges. The burden of a labor lawyer in our courts is not easy.

"My position on the committee is that I shall defend the right of any member of our profession to appear habitually, if he desires, in labor causes, and the right of a man at the bar to become a 'labor lawyer' as well as to be a 'corporation lawyer.' I expect him to pay such penalty as would be exacted from the lawyers on the other side if they were guilty of similar conduct. I do not expect a breach of conduct which would be passed, generally, with a small fine or an apology to be made the excuse for depriving a labor lawyer of his right to practice his profession, or to deprive labor of a representative who has zeal in its cause, even if the zeal is sometimes misdirected.

"I, with the others, will leave no stone unturned to see that this effort does not succeed and to focus public opinion on the effort if it is persisted in.
"Sincerely yours,
"Robert H. Jackson."
"America's Advocate: Robert H. Jackson", by Eugene C. Gerhart, p. 152.

33. See Ackerman v. International Longshoremen's & Warehousemen's Union, 9 Cir., 187 F.2d 860.

bor next door whose ideas we did not like. But today we know that the real threat comes from a different direction and it is an open one: "We'll bury you!" Free men cannot be buried. But if we insist on chipping away our heritage of liberty and freedom then indeed we shall be in danger of losing the decisive battle,—that for the minds and hearts of men. Mr. Justice Jackson put it well when he said: "I have not been one to discount the Communist evil. But my apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else." [34]

### The Affidavit Concerning the Juror

The second charge in the complaint relates to appellant's alleged misconduct in interviewing the juror in the Fujimoto case after the verdict had been returned. After alluding to the fact that "it has not been uncommon, if not in fact common practice," for attorneys to interrogate jurors after rendition of verdict by them, and adding that any one who "*hereafter* . . . interrogates one who has been . . . a juror of a trial jury*", as to any occurrence in the jury room or as to what may have been persuasive in reaching the verdict "acts at his peril*", the court then concluded: "However, in the instant matter, this court will let its hereinbefore expressed disciplinary order—suspending the said respondent licensee from the practice of law in the territorial courts for one year and requiring her to pay costs—suffice, al-though also deeming gross misconduct her said repeated interviews with and interrogations of David Fuller." (Emphasis mine) I think it is plain that the court below simply took no action on this charge. Judge Chambers said: "To us, this is a statement that the penalty for the two charges is imposed concurrently —the same penalty for both charges." The court might have said that, but it did not.[35]

Even the majority concede that if the case were to be reversed on the first charge this second one would have to be referred back to the territorial court. It is my view that there is no justification for any such remand or for any order other than a flat reversal and dismissal of the whole proceeding.

It would be hard to find a more frivolous charge than this second one relating to the affidavit. I shall touch upon that shortly, but first I make inquiry as to whether we may review action of the Hawaii court upon that second charge if we assume that it took any.

A reading of the majority opinion indicates that the court has no doubt of its power to review such a decision for it proceeds to review it at length. I thoroughly agree that we have such power. Our jurisdiction arises under § 1293 of Title 28.[36] Most of what I have said heretofore demonstrates that we have here a case of violation of the Constitution. The Court of Appeals for the First Circuit operates under the same jurisdictional statute. It has often held that in a case which presents a federal question, the whole proceeding is reviewable, and

---

34. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 227, 73 S.Ct. 625, 637, 97 L.Ed. 956 (dissenting opinion).

35. Convincing proof that the Hawaii court did not think it was passing on the second charge is the fact that Chief Justice Towse signed the opinion. It was his view that his court could not entertain this charge, and that it should be dismissed "as an interference with the administration of justice in the United States District Court for the District of Hawaii and a possible usurpation of the power thereof."

36. "1293. Final decisions of Puerto Rico and Hawaii Supreme Courts.

"The courts of appeals for the First and Ninth Circuits shall have jurisdiction of appeals from all final decisions of the Supreme courts of Puerto Rico and Hawaii, respectively in all cases involving the Constitution, laws or treaties of the United States or any authority exercised thereunder, in all habeas corpus proceedings, and in all other civil cases where the value in controversy exceeds $5,000, exclusive of interest and costs."

the court has jurisdiction to decide "whatever questions of local law may be presented regardless of amounts in controversy." Riera v. Mercado Riera, 1 Cir., 152 F.2d 86, 92.[37] Moreover, this is a case "where the value in controversy exceeds $5000 exclusive of interest and costs." It is shown here, and the fact is not controverted, that one year of appellant's practice has a value to her of more than $5000.[38] That such facts give us jurisdiction was recognized by this court in Whittemore v. Farrington, 234 F.2d 221. That was a case in which jurisdiction depended upon the value in controversy. The court found such jurisdiction was lacking because the most it could discover by way of value was some $1600 which one Edmund Leavy would have lost in trustee's fees. But in its footnote 7, (at page 225) it recognized the general principle applicable here: "For the general principle that the measure of the value in controversy, for purposes of testing the jurisdictional amount, in suits wherein the plaintiff seeks specific relief rather than damages, is the value of such relief to the plaintiff, see Hunt v. New York Cotton Exchange, 205 U.S. 322, 27 S.Ct. 529, 51 L.Ed. 821. In First State Bank v. Chicago, R. I. & P. R. Co., 8 Cir., 1933, 63 F.2d 585, 90 A.L.R. 544 the rule is applied to an action brought to abate other actions."

The same principle is often applied in passing upon the jurisdiction of a United States district court where it is dependent upon amount in controversy. Thus in an injunction suit designed to protect a business or property the necessary amount in controversy may exist notwithstanding there may be no prayer for damages. See Hunt v. New York Cotton Exchange, 205 U.S. 322, 336, 27 S.Ct. 529, 51 L.Ed. 821; Bitterman v. Louisville & N. R. Co., 207 U.S. 205, 225, 28 S.Ct. 91, 52 L.Ed. 171; Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111.

I see no possible excuse for saying that the right to practice law is a privilege which is priceless and beyond value and hence there cannot be a value in controversy. If disbarment is sustained, Mrs. Sawyer will lose more than $5000 and that is all there is to it.

Appellant cannot be disciplined in the Hawaii court for conduct in connection with a case in the federal court which federal law holds proper. This case bears no resemblance to In re Isserman, 9 N.J. 269, 87 A.2d 903. In that case, the conduct condemned, besides the rape conviction, was iniquitous no matter where carried on. Here the Supreme Court of Hawaii expressly recognized that interviewing jurors after verdict was common practice for lawyers in Hawaii. Yet if Judge Chambers is right, it proceeded to impose a suspension of practice on appellant for following that common practice, all because of its rule stated to be a guide for counsel "thereafter". But such an order reaches even greater heights of absurdity. It suspends for conduct in connection with a federal case which the federal courts have recognized to be proper.

An able discussion of the propriety of procuring post-verdict affidavits from members of a jury is that of Judge Learned Hand in Jorgensen v. York Ice Machinery Corp., 2 Cir., 160 F.2d 432, 435. That was a case in which the court considered at great length affidavits of jurors presented in support of motions for new trial disclosing the deliberations in the jury room while the case was under submission. The court held that whether a new trial should have been granted was a matter within the judge's discretion, but the court assumed the propriety of procuring the testimony of the jurors as to what happened. Citing Mr. Wigmore's work on Evidence, the court criticized, as does Mr. Wigmore, the oft-quoted statement that jurors may not

---

37. "We are not prepared to say that all of these federal questions are colorable and frivolous. Thus regardless of how we decide them, we have jurisdiction under § 128 of the Judicial Code, supra, not only to consider them but also to go further and decide whatever questions of local law may be presented regardless of amount in controversy."

38. This proof was made by affidavit in accordance with Title 28, § 2108. See De La Torre v. National City Bank of New York, 1 Cir., 110 F.2d 381, 384, approving this procedure.

"impeach their verdict." The court cited McDonald v. Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 785, 59 L.Ed. 1300, which discussed the propriety of the use of affidavits of jurors as to what happened in the jury room. That case stated: "Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.'" Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, furnishes an instance in which the court held that affidavits of jurors were properly used to show overt acts in the jury room which are accessible to the knowledge of all the jurors.[39]

Since jurors' affidavits may thus be used on motions for new trial, a lawyer may of course interview the juror for the purpose of procuring the facts and the affidavits; otherwise they would be unobtainable. Of course it was the appellant here who made the affidavit. That affidavit is subject to the infirmity that it is hearsay. Even so, it would not be inappropriate to furnish such information to the judge; he might wish to pursue the inquiry himself. Cf. Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435. But the appellant is not charged with the offense of presenting hearsay. (If that were an offense the ranks of the legal profession would indeed be decimated.) The impropriety charged here is Mrs. Sawyer's interview with the juror. Let it be conceded that if the juror Fuller had sworn to everything that was in appellant's affidavit, his testimony would not have furnished any basis for a new trial. But this is the first time I have ever heard it suggested that an attorney may be suspended from practice for attempting to present evidence of doubtful relevance or

competency. The court below is without power to discipline appellant for acts done in a case in a federal court which, under the decisions of the federal courts, she had a right to do.

Suppose appellant had done much worse things. Suppose she had even been guilty of contempt of the court. The rule established by In re Isserman, 345 U.S. 286, 290, 73 S.Ct. 676, 97 L.Ed. 1013, and 348 U.S. 1, 75 S.Ct. 6, 99 L.Ed. 3, is that a lawyer is not subject to suspension or disbarment in any court merely because he has been convicted of contempt.[40]

Under Title 28, § 2106, we may direct the entry of such appropriate judgment as may be just under the circumstances. The only appropriate or just judgment here is one dismissing the proceedings.

As is elsewhere apparent, the foregoing part of this opinion was written and circulated prior to the writing of Judge BARNES' concurring opinion. What I have said above sufficiently discloses why my view of the facts differs from that which he expresses. Assuming that the dissenter normally writes last, I have only one word to add:

I think Judge BARNES in, as it were, dissenting from my dissent, has misunderstood my version of the facts. It will be noted that I said: "In my view there can be no other conclusion here than that the appellant's speech was an attack upon the Government's method of procedure in Smith Act cases including the one then on trial at Honolulu; and an attack upon the Smith Act generally." I did not say or suggest that appellant was not discussing the *pending* case. This is further plain from the fact that I treated at length, with reference to the Bridges, Pennekamp and Harney cases, the consequences of the appellant's attack relating to a *pending* case. Essentially my point

---

39. The whole subject of the use of such affidavits by jurors is treated at length by Wigmore, 3d Ed., Vol. 8, §§ 2352, 2354.

40. "We do not recall any previous instance, though not venturing to assert that there is none, where a lawyer has been disbarred by any court of the United States or of a state merely because he had been convicted of a contempt." 345 U.S. 292, 73 S.Ct. 679. This is the opinion of the four Justices who were the majority at 348 U.S. 1, 75 S.Ct. 6. See footnote 34, supra.

232

has been that the speech must be read in context, and the context was all Smith Act cases, including this one. I cannot agree that an attack on a pending case is by reason of that fact an attack on the judge who presides in it.

STEPHENS, Chief Judge (dissenting).

I join Judges POPE and HAMLEY in dissenting to the majority decision of the Court.